UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

Gabriel D'JAMOOS,

                    Plaintiff,

          -against-                                <u>MEMORANDUM AND ORDER</u>
                                                   00-CV-1361 (ILG)

Michael GRIFFITH,

                    Defendant.

-------------------------------------------------x

GLASSER, United States District Judge:

## **INTRODUCTION**

This action concerns legal services provided by defendant attorney Michael

Griffith ("defendant" or "Griffith") to plaintiff Gabriel D'Jamoos ("plaintiff" or

"D'Jamoos") in connection with a commercial dispute (the "Belmont Action") involving

two businesses owned by John Lucchese ("Lucchese"), the Belmont Realty Corp.

("Belmont") and Park Terrace Corp. ("Park Terrace"). D'Jamoos sued Griffith for

malpractice, among other things, and defendant counterclaimed for attorney's fees,

measured either under the contingency fee agreement or, in the alternative, quantum

meruit. This Court granted summary judgment in favor of defendant dismissing the

malpractice complaint in its entirety. Pending before the Court is defendant's motion

for summary judgment on its counterclaims.

## **BACKGROUND**

In 1986, plaintiff retained defendant to represent him in a commercial dispute

stemming from plaintiff's financial involvement in Belmont Realty Corporation, which

at the time was controlled by plaintiff's brother-in-law Lucchese.  (Def. 56.1 Stmt. ¶ 2)

(Ex. A 4).  According to D'Jamoos, he and Lucchese orally agreed that the $175,000

D'Jamoos paid into the business was a capital contribution.  (See, D'Jamoos v. Griffith,

Memorandum & Opinion, 00-cv-1361, August 31, 2004 (Docketed 9-02-2004)

(hereinafter "M&O") (unpublished)).  In opposition, Lucchese contended that D'Jamoos'

contribution was merely a loan.  (Plt. 56.1 Stmt. ¶ 21).

The matter was not resolved amicably, and by 1990, D'Jamoos began to prepare

for litigation.  (Forte Aff., Ex. G).  In June of 1990, Griffith sent D'Jamoos a contingency

fee agreement.  It provided for:

> 1. An initial retainer in the sum of $10,000 to cover services up to but not including a trial of the action plus 2.  A contingent fee of 20% of any recovery whether by settlement, trial or otherwise.  3.  In the event a trial of the action is required, there will be a per diem trial fee in an amount to be mutually agreed upon, said per diem trial fee to be credited against the contingent fee above described.

(Forte Aff., Ex. C).[1]

Suit was commenced in July of 1990 in New York Supreme Court, Richmond

County, against John Lucchese and Georgette Lucchese, who is D'Jamoos' sister and, at

the time, was in the process of divorcing John Lucchese.

This action went to trial in February of 1997.  (Gabriel D'Jamoos v. John

Lucchese, Belmont Realty Corp. and Park Terrace Corp. (Index No. 120/92) ("Belmont

Action")).  At the close of that trial the parties appeared to put an oral settlement

agreement on record ("1997 Stipulation"). However, it was never signed by the parties

---

[1] The copy of this retainer agreement submitted to the Court is unsigned by any party.  However, both parties concede that this copy is an authentic reproduction of the retainer agreement's terms.

and never converted into a binding agreement.[2]  (Def. 56.1 Stmt. ¶ 3) (Ex. D 4-5).

In March of 1998, a second settlement agreement was proposed ("1998 Settlement") whereby plaintiff would obtain a 49% interest in Belmont Corporation, without regard to previous capital contributions.  "On the record, DeVito advised plaintiff that Belmont was a single asset corporation.  At the close of that proceeding, Justice Maltese swore in plaintiff and engaged in the following colloquy:

> The Court: Sir, have you heard the discussion that's taken place here this morning?
> D'Jamoos: I did.
> The Court: And are you in agreement with the basic structure that is being proffered to you to settle this case?
> D'Jamoos: I suppose.
> (Attorney confers with client).
> D'Jamoos: Yes, your Honor.
> The Court: And this has been explained to you by your lawyer?
> D'Jamoos: Most of it.
> The Court: And it has to be finalized?
> D'Jamoos: Yes.
> ....
> The Court: Do you have any questions at this point?
> D'Jamoos: No."
 (M&O, 5-6).

This agreement was never finalized.  The action concluded without plaintiff receiving anything, including his original capital contribution.  (Def. 56.1 Stmt. ¶ 4) (Ex. D p. 5-7).  An attempt at settlement was again made in September of 1998, with a written stipulation agreeing to the terms of the 1998 Settlement.  (See, D'Jamoos v. Griffith, 368 F.Supp.2d 200, 202 (E.D.N.Y. 2005)).

---

[2]  D'Jamoos insinuates that the 1997 Stipulation was a binding settlement since it was agreed to in open court.  As discussed infra, this Court has noted that, at the time, the parties and Justice Maltese who presided over that action considered that discussion to be tentative, subject to a subsequent written settlement.  The stipulated settlement collapsed because Georgette Lucchese threatened to assert a claim for marital waste if the 1997 Stipulation was enforced.

For reasons not fully clear, by 1999 the plaintiff still had not received the shares pursuant to the settlement. On December 1, 1999, plaintiff terminated defendant's legal services. (Def. 56.1 Stmt. ¶ 5) (Forte Aff., Ex. H). In May of 2000, plaintiff commenced an action in state court to "rescind" the 1998 Settlement and reinstate the 1997 Stipulation in light of Lucchese's failure to tender the Belmont stock to D'Jamoos. (M&O, 6). On June 16, 2000, Judge Maltese held that the 1997 Stipulation was unenforceable, and ordered that John Lucchese tender the remaining 49% shares of outstanding stock to D'Jamoos, in accord with the 1998 Settlement. (Forte Aff., Ex. I). On July 19, 2000, plaintiff commenced this action, asserting legal malpractice and other related state law claims against Griffith.[3] Twelve days later, D'Jamoos rejected the tender to him of the 49% share in Belmont. (Forte Aff., Ex. J). In August of 2001, after plaintiff amended the complaint, defendant filed a pre-answer motion to dismiss which was denied. Afterwards, defendant answered the complaint, asserting counterclaims for attorney's fees either based upon the contingency fee agreement or, in the alternative, in quantum meruit.

Defendant also moved for summary judgment against the complaint in 2004. Pursuant to defendant's motion, this Court dismissed the complaint in its entirety (Ex. D), leaving only defendant's counterclaims.[4]

Defendant now moves for summary judgment on those counterclaims, urging the

---

[3] That suit included claims for (1) legal malpractice (2) violation of New York Judiciary Law 487 due to a purported conflict of interest; (3) breach of fiduciary duty based on defendant's purported failure to disclose the conflict; (4) common law fraud based on defendant' purported failure to disclose the conflict. (Def. 56.1 Stmt. ¶ 6) (Ex. A).

[4] Plaintiff's March 4, 2005 motion to dismiss those counterclaims was also dismissed in its entirety. (D'Jamoos, 368 F.Supp.2d at 200).

Court to find that he is entitled either to the contingency fee in the retainer agreement or, in the alternative, a payment based upon quantum meruit.

Plaintiff opposes the defendant's motion for summary judgment as follows: First, plaintiff contends that the discharge of defendant was "for cause," prior to the conclusion of the case, entitling defendant to nothing. Second, plaintiff argues that defendant's request for legal fees, coming almost two years after being dismissed, should be barred by laches.

For the following reasons, defendant's motion is granted.

## DISCUSSION

### I. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses..." Celotex Corp. v. Catrett, 477 U.S. 317, 323-4 (1986).

As an initial matter, "the moving party bears the burden of establishing the absence of any genuine issue." Grabois v. Jones, 89 F.3d 97, 99-100 (2d Cir. 1996) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Once the movant points to the absence of an issue, the non-moving party must produce evidence of a genuine issue of material fact. The nonmoving party "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must go beyond the pleadings to "set forth specific

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  See also

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  A genuine issue of material fact exists

when there is sufficient evidence favoring the nonmoving party such that a jury could

return a verdict in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

When evaluating a motion for summary judgment, "[t]he courts must view the

evidence in the light most favorable to the party against whom summary judgment is

sought and must draw all reasonable inferences in his favor."  L.B. Foster Co. v.

American Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986)). If there remains no genuine issue of

material fact then the moving party is entitled to judgment as a matter of law.

## II.  Retainer Agreement

Defendant's request for damages pursuant to the retainer agreement must be

denied, because defendant cannot show that his obligations under the agreement were

fulfilled prior to plaintiff's dismissal of him.

The attorney-client relationship is necessarily one of trust and confidence, and

New York public policy grants clients a right to terminate that relationship at any time.

Matter of Dunn, 205 N.Y. 398, 402 (1912).  The rules governing attorney's fees in the

event of discharge are "well calculated to promote public confidence in the members of

an honorable profession whose relation to their clients is personal and confidential."

Garcia v. Teitler, 2004 WL 1636982, *5 (Gleeson, J.) (citing Campagnola v. Mulholland,

Minion & Roe, 76 N.Y.2d 38, 43 (1990).  "It is well settled that a client may discharge an

attorney from the further performance of services at any time, with or without cause." In

the Matter of the Estate of Charles R. Stevens, 252 A.D.2d 654, 655 (3d Dep't 1998)

(citing Matter of Cohen v. Grainger, Tesoriero & Bell, 81 N.Y.2d 655, 658 (1993); Martin v. Camp, 219 N.Y. 170, 174 (1916)). If an attorney is discharged for cause, he is not entitled to compensation. Id.; Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz, 370 F.3d 259, 263 (2d Cir. 2004).

When an attorney is discharged without cause before the completion of services, he may only recover on a quantum meruit basis. Cf., Teichner v. W & J Holsteins, 64 N.Y.2d 977, 979 (N.Y. Ct. App. 1985). Quantum meruit recovery is called for even where the attorney discharged without fault was employed under a contingent fee contract. See Smith v. Boscov's Dep't Store, 192 A.D.2d 949 (3d Dep't 1993).

It cannot be said that representation in a matter has been terminated by settlement, where the client has yet to receive any of the settlement proceeds, and the contract provides for a percentage "of any recovery." Cf., Tillman v. Komar, 259 N.Y. 133, 135 (1932) (Client's right to recover had been established and the litigation was terminated except for a computation by a referee of the amounts due, but Court found that attorney could only recover in quantum meruit.). See also In re Matter of Krooks, 257 N.Y. 329, 178 N.E. 548 (N.Y.Ct.App. 1931) (although judgment had been entered in favor of client, money had not actually been collected, so quantum meruit standard applied).

In this regard, the record reflects that there had been no "recovery" prior to D'Jamoos' discharge of Griffith. As the language of the retainer agreement indicates, Griffith's contingency fee was based upon the "recovery" of an award through litigation, settlement or otherwise. Since Griffith's representation of D'Jamoos had not yet been completed when he was discharged, he may only recover, if at all, through quantum

meruit.

## III. "For Cause" Termination

### A. Law

A "for cause" termination bars the recovery of legal fees. Despite the often significant financial consequences flowing from such a termination, New York courts have not explicitly defined "for cause." <u>Garcia</u>, at *5. "Unlike the analysis in a subsequent malpractice action, the 'for cause' inquiry simply asks whether the client was justified in terminating the attorney-client relationship." <u>King v. Fox</u>, 2005 WL 3098933, *5 (S.D.N.Y. 2005).

A "for cause" termination does not require that the client establish every element of a malpractice claim. For example, a client need not prove "damages' to justify for cause termination, while "damages" is a prima facie element of a malpractice claim. (<u>Town of North Hempstead v. Winston & Strawn, LLP</u>, 28 A.D.3d 746, 748 (2d Dep't 2006) (identifying "damages" as a prima facie element of a malpractice claim). Although a client terminating his attorney for cause need not show actionable malpractice, the New York Court of Appeals has not defined a clearly distinct "for cause" standard apart from the "malpractice" standard. <u>See</u> <u>e.g.</u>, <u>Marschke v. Cross</u>, 82 A.D.2d 944 (3d Dep't 1981) (offering no definition at all). <u>See</u> <u>also</u> <u>In the Matter or Weitling</u>, 266 N.Y. 184, 187 (1935) (noting that for cause termination requires a finding of "misconduct," without defining the term). Admittedly, what constitutes cause is not entirely clear. Based upon the seeming void in state standards for "for cause" termination, plaintiff urges upon the Court a sweeping definition of cause, citing <u>Garcia</u>, which, in summarizing "for cause" discharges in New York courts, lists eight factors

which have been considered: (1) failure to perform under the employment contract; (2) lack of diligence in performing; (3) lack of ordinary skill or care in so performing; (4) making demands on the client which violate the terms or exceed the scope of the contract; (5) taking actions contrary to the clients interest or objectives; (6) indulging in unprofessional conduct while handling the client's affairs; (7) venting of personal or economic hostility toward the client; and (8) loss of the client's trust and confidence. Garcia, at *18-19 (citing 31 Am.Jur. Proof of Facts 2d 125, § 7). While any or all of these factors may serve as a basis for "for cause" discharge, it is apparent that the Garcia court was summarizing appellate cases, and was not, by this list, announcing the standards by which for cause discharge is adjudged. An examination of New York case law indicates that when any of these factors was asserted as the basis of a "for cause" discharge determination, the underlying behavior was either a form of malpractice or strongly suggestive of it. Matter of Spatola, 196 Misc.2d 666 (Surr. Ct. 2003) (attorney failure to timely file wrongful death claim and concealment of that from client); In the Matter of Stevens, 252 A.D.2d 654 (significant delay in filing complaint and failure to issue a demand letter to an insurance company justified for cause termination); Sokoloff v. Sokoloff, 82 Misc.2d 797 (1975) (attorney discharged for cause where he was disqualified from representing wife in separation proceedings while concurrently representing husband in other matters); Rotker v. Rotker, 195 Misc.2d 768, 770 (N.Y. Sup. Ct. 2003) (defining "for cause" as "attorney misconduct or the unjustifiable abandonment of the representation").

Although a client need not plead malpractice to justify "for cause" discharge, it is clear that personality conflicts, misunderstandings, or differences of opinion having

nothing to do with impropriety by the lawyer do not constitute cause. <u>Allstate Ins. Co. v. Nandi</u>, 258 F.Supp.2d 309, 312 (S.D.N.Y. 2003). "Courts typically find a discharge 'for cause' where there has been a significant breach of legal duty." <u>Id</u>. Moreover, "after-acquired" evidence is not relevant to the issue of whether the discharge was for cause, since that evidence cannot have played a role in causing the discharge. <u>King</u>, at *5.

### B. Plaintiff's Arguments

Plaintiff makes several factual assertions that he believes justify "for cause" termination. Essentially all of these assertions were made to this Court in 2004, when defendant successfully moved to dismiss the entirety of plaintiff's complaint. Plaintiff submits no new evidence, but contends instead that since the "for cause" standard imposes a lesser burden of proof than the malpractice standard, those allegations are sufficient to deny this motion. Giving the benefit of every inference to plaintiff's evidence, it is clear that none of these arguments could justify "for cause" termination.

### 1. Delay in bringing the lawsuit

Plaintiff contends that even though he retained defendant in 1986, it took three and a half years to bring the lawsuit, and took nearly seven years to be brought to trial. (Plt. Mem. Law 8). He implies, without presenting evidence, that defendant was responsible for the delay, citing only to the conclusory assertions by plaintiff's expert. That expert states that during the 13 years defendant represented plaintiff, "it appears that the attorney did little to advance his client's case." (<u>Krouner Aff.</u>, Ex. B. "Expert Report of Howard A. Levine"). This same argument led this Court to conclude that "plaintiff has provided absolutely no evidence that these delays were attributable to the defendant." (M&O, 12).

Even if the delay was caused by defendant, plaintiff presents no evidence that his claims were ever compromised by this delay. The mere assertion that defendant brought the suit in 1990 and "it took seven years before the case was actually brought to trial," while accurate, is inadequate to support an inference that defendant was to blame. In addition, plaintiff presents no evidence at all that he urged an earlier commencement of litigation or that defendant failed to follow any order or request to commence litigation earlier. He does not dispute a 1990 letter he sent to defendant which expresses no discontent at the pace of litigation, belying his claims to the contrary. (Forte Aff., Ex. G). This claim cannot therefore provide a basis for a "for cause" termination.

Finally, the plaintiff 's acknowledgment, set out above, under oath, to Justice Maltese, regarding the March, 1998 Settlement, that he agreed with the terms of that settlement, warrants the invocation of the doctrine of judicial estoppel which is aimed at preventing "a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir.), cert. denied, 510 U.S. 992 (1993); Simon v. Safelite Glass Corp., 943 F.Supp. 261 (E.D.N.Y. 1996), aff'd, 128 F.3d 68 (1997). That "doctrine seeks to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions" and "protect[s] judicial integrity by avoiding the risk of inconsistent results in two proceedings." Bates, supra. Having sworn that he understood the structure of the settlement which was explained to him by his lawyer and was in agreement with it, his belated attempt to disavow it should not be countenanced.

## 2. Failure to depose witnesses

Plaintiff asserts that "Griffith never subpoenaed or deposed Bernie Homer, the accountant for Belmont Corporation.... nor did he depose any of Lucchese's other principals in Park Terrace, William Santini or Randy Webster," nor did he call any expert witnesses. (Plt. Mem. Law 9). Plaintiff further contends that defendant's lack of preparation at trial was evinced by the fact that he was forced to amend his pleading to conform to the proof, and that he only called three witnesses. (Id.).

Plaintiff provides no analysis for why the failure to call more than three witnesses or to call those witnesses he now claims were essential had any material impact on the case. Without evidence substantiating the assertion, plaintiff contends that these witnesses could have supported his claim that his contribution was an investment. (Plt. Mem. Law 9). Plaintiff provides no deposition testimony of those individuals, or evidence that their statements would have improved his bargaining and/or litigation position. Moreover, in evaluating the parties' submissions on this same issue on the summary judgment motion, this Court noted that D'Jamoos admitted that several of the plaintiffs witnesses would have only had knowledge of the parking lot component of the business, the Park Terrace enterprise, and, as such, "Griffith believed that their testimony would have had little probative value." (M&O, 13). Plaintiff does not rebut that deposition evidence here. Like every choice in litigation, the attorney and client must weigh the costs of an action against its expected benefits. Here, plaintiff presents no evidence that defendant erred in that calculus, and if he did, it would represent only a strategic mistake incapable of grounding a "for cause" termination claim. See, e.g., Allstate Ins. Co. v. Nandi, 258 F.Supp.2d 309, 312 (S.D.N.Y. 2003). Litigation is not an exact science, and a client cannot second guess an attorney's decisions with the benefit

of hindsight, looking for arguments or strategies that would have been more favorable, and then using them to justify withholding payment. <u>King</u>, <u>supra</u>, at *5. To permit such behavior would moot the significance of the oft-quoted rule that attorneys are not guarantors of the success of litigation. <u>Lieberman v. Pettinato</u>, 126 Misc.2d 215, 219 (N.Y. Sup. Ct. 1984).[5]

### 3. Actions contrary to client interest: pursuit of real estate interest

Plaintiff contends that the retainer agreement provided defendant with a "fractional real estate ownership interest claim in his client's case." (Plt. Mem. Law 9). Plaintiff interprets the retainer agreement to give defendant an equity stake–as opposed to its equivalent in monetary terms–in whatever proceeds were recovered. Plaintiff argues that since a 20% interest in the Belmont would have been worth more than a 20% interest in a cash settlement, Griffith pursued a property settlement exclusively and to the detriment of his client, D'Jamoos.

As this Court stated previously, "plaintiff has failed to demonstrate that he and defendant had differing interests in the fee agreement." (M&O, 19). It bears noting once again that the plaintiff, who is not a neophyte in matters of finance as Justice Maltese had occasion to observe (<u>see</u>, <u>infra</u>, discussion, III.B.7), understood the terms of the settlement proffered to him in 1998 and voluntarily agreed to accept it without reservation. His belated misgivings about it now sought to be expressed through fanciful criticisms of his lawyer is as unseemly as it is unfounded.

### 4. Failure to consummate the 1997 Stipulation

---

[5] Moreover, judicial estoppel applies with equal force to this argument as well.

Plaintiff contends that defendant's failure to consummate the 1997 Stipulation, which involved a cash payment, was inimical to plaintiff's interest. (Plt. Mem. Law, 10). As this Court stated in 2004, "plaintiff's colloquy with Justice Maltese plainly demonstrates that Justice Maltese, the parties, and their attorneys understood that a written...stipulation of settlement was to be signed by the parties before the 1997 Stipulation became binding." (M&O, 14). There was, therefore, no Stipulation to be enforced. Whether or not defendant could have successfully reinstated the 1997 Stipulation is mere speculation contrary to the facts developed in the record. That Stipulation ultimately collapsed because Georgette Lucchese "planned to regard the settlement as a diminution in the value of the marital estate." Id. Finally, plaintiff's argument is belied by the fact that he subsequently agreed, before Judge Maltese, to the 1998 Settlement. His subsequent endorsement of the 1998 Settlement for a percentage of the business belies any complaint he might have had regarding the 1997 Stipulation.

### 5. DeVito conflict

Plaintiff asserts that defendant sought legal advice from his adversary in the Belmont Action, Ronald DeVito, regarding a totally separate FDIC action in which defendant had been sued. Griffith retained DeVito in July of 1999 to address the limited issue of governmental immunity and whether he could assert an affirmative defense calling for an offset. (M&O, 7). It is not disputed that defendant obtained legal advice from DeVito in the FDIC action free of charge, the value of which DeVito represented to be between $27,500 and $30,000. (Plt. 56.1 Stmt. ¶ 24). Plaintiff's contention is that because DeVito provided the services for free, Griffith failed to attempt a more favorable settlement for D'Jamoos, and failed to advise him of the tax ramifications of the 1998

Settlement. In reference to this same argument heard on defendant's 2004 summary judgment motion, this Court found that "plaintiff's assertion of defendant's negligence is flawed on two counts. The causal relationship between the retention of DeVito and Meenan[6] and Griffith's alleged negligence in pursuing a settlement is plainly speculative and the assertion of Griffith's negligence is an *ipse dixit*." (Id.) (footnote added).

In that action, this Court found that all of the substantial work in the Belmont Action had been completed by the time Griffith obtained DeVito's services, making it "not a substantial factor, if it was a factor at all" in the outcome of the Belmont Action. D'Jamoos presents no additional evidence here to alter the Court's opinion in this regard. Although plaintiff attaches a highly-excerpted deposition of DeVito (Krouner Aff., Ex. E), it provides nothing from which a trier of fact could infer that his advice to defendant occurred either while substantial work in the Belmont Action was ongoing, or caused Griffith to not zealously represent his client.[7] Finally, plaintiff does not contend that he discharged defendant based upon this presumed conflict of interest. After-discovered facts cannot form the basis of a "for cause" dismissal. King, at *5.

### 6. Loss of trust

Plaintiff's sixth "for cause" argument is that he lost trust in Grifitth based upon the aforementioned allegations. Since those allegations could not serve as a basis for a "for cause" termination, they similarly cannot support a "lack of trust" argument.

---

[6] Meenan represented Griffith in the FDIC action and was at one time of counsel to the law offices of Ronald DeVito. According to DeVito, Meenan rented office space in DeVito's law firm and, in return, made himself available to DeVito to assist in litigation. (M&O, 7-8).

[7] To the extent that D'Jamoos argues that Griffith's relationship with DeVito prevented him from revealing adverse tax consequences of the 1998 Settlement, it is discussed infra, III.B.7.

Plaintiff relies upon <u>Matter of Spatola</u>, 196 Misc.2d 666 (Surr. Ct. 2003). In <u>Spatola</u>, the court held that the firm's failure to notify plaintiff that it had not timely filed her wrongful death claim constituted a breach of trust justifying for cause termination. <u>Id.</u>, at 668. Such a failure is clearly an act of malpractice. Here, defendant has won summary judgment against plaintiff's malpractice claims, making <u>Spatola</u> inapposite. Plaintiff makes no factually supported allegations sufficient to justify his assertion that his trust and confidence in his attorney had been intentionally or negligently undermined or compromised. <u>Spatola</u> does not stand for the proposition, as plaintiff would need it to, that a subjective feeling of lack of trust constitutes a "for cause" basis for termination. To be certain, a client may fire an attorney at any time, for whatever reason, including an otherwise unfounded belief that the attorney has acted against the client's interests. But such a subjective feeling does not permit a client to avoid paying the fair value of services previously rendered.

### 7.  No chance of recovery

Lastly, plaintiff asserts that when he discharged defendant, "he reasonably believed that he would not recover any damages from the [Belmont] Action" because of the tax consequences of the transaction. Plaintiff also contends that when a client fails to recover in his action and the discharged attorney was working on a contingent fee basis, that attorney may not recover under quantum meruit. <u>Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz</u>, 370 F.3d 259, 264, n. 7 (2d Cir. 2004). <u>See also</u> <u>Tuff & Rumble Mgmt., Inc., v. Landmark Distributors, Inc.</u>, 254 A.D.2d 15 (1st Dep't 1998) ("since...appellant was retained on a contingency fee basis, and that...action ...concluded...without any recovery by plaintiff, the amount owed ...by plaintiff to

appellant is limited to the latter's disbursement's").

The argument fails for several reasons. First, it does not appear that defendant was ever requested by the plaintiff to consider the tax consequences of the transaction.

Second, plaintiff's argument is belied by his sworn statement of satisfaction with his 1998 representation in open court and his own particular expertise. D'Jamoos was an executive of a major corporation, and a former accountant for Belmont. As this Court noted in 2004, D'Jamoos had the ability to assess the settlement's consequences. Quoting Justice Maltese:

> [T]his is not a case of an unrepresented person without counsel who naively entered into a settlement. Indeed, Mr. D'Jamoos possesses a master's degree in finance, and was a financial officer for General Motors Corp. In its oversees [sic] operations. Mr. D'Jamoos was provided with the financial statement for Belmont Corp. (Year Ending 12/31/97). Moreover, he was the former bookkeeper for Belmont who was familiar with the books and records until his falling out with his brother-in-law, John Lucchese.

(M&O, 15).

Griffith's failure to give D'Jamoos tax advice furnishes no grounds for "for cause" termination. However, plaintiff may raise his failure to do so in a determination of the value of Griffith's services. See Holmberg, Galbraith, Holmberg, Orkin and Bennett v. Koury, 176 A.D.2d 1045, (3d Dep't 1991) (permitting the reasonableness of plaintiff-attorney's in-court charges to be determined on a hearing.).

Plaintiff refers to Universal Acupuncture for the contention that "if a client who retained an attorney under a contingent fee agreement discharges that attorney because there is no chance of recovery for the client, the discharge may be for cause, and the attorney may not be entitled to fees in quantum meruit." (Universal Acupuncture, 370 F.3d at 265, n. 7) (citations omitted). That case is inapposite, since the results achieved

by Griffith prove that there was some chance of recovery, it cannot properly be considered a "loss" to D'Jamoos. Ultimately, it was D'Jamoos who rejected the settlement terms he had previously agreed to.[8] Moreover, whatever recovery was had by plaintiff after Griffith was discharged cannot affect his right to quantum meruit, since Griffith "did not contract for his contingent compensation on the hypothesis of success or failure by some other member of the bar." Tillman v. Komar, 259 N.Y. 133, 135 (1932).

In sum, none of the aforementioned arguments are sufficient grounds for a "for cause" termination argument. Ultimately, a finding that an attorney was terminated for cause must express something more than a disagreement on strategy or conflict in personality, because a discharge for cause and the loss of compensation imposed thereby are in the nature of a penalty. DeLuccia v. Village of Monroe, 180 A.D.2d 897, 899 (3d Dep't 1992).

## IV. Laches

Plaintiff's last argument is that the counterclaim is barred by the doctrine of laches, contending that since he did not bring his claim when it became ripe, that is, when he was discharged, he cannot bring it now. Laches is "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party" (In re Linker, 23 A.D.3d 186, 189 (1st Dep't 2005) (citing Saratoga County Chamber of Commerce v. Pataki, 100 N.Y.2d 801 (2003). The mere lapse of time,

---

[8] Moreover, even after the settlement, plaintiff admits that he did recover something from the settlement when represented by his present attorney, Mr. Krouner. (Griffith Aff., Ex. L, ¶ 25) ("...in a few months time, my new attorney procured for me title to the Uncas Property, the ownership of which was never disputed.").

without a showing of prejudice, is insufficient to sustain a claim of laches Id.  Prejudice may be demonstrated "by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay." (Skrodelis v. Norbergs, 272 A.D.2d 316, 317 (2d Dep't 2000).

Here, plaintiff does not argue or explain how he has been prejudiced in any way by the timing of defendant's counterclaim.  Furthermore, based upon the record, the Court finds that the counterclaims were timely served upon plaintiff after his second amended complaint was entered.  There is therefore no reason in equity to consider them time barred.

Finally, plaintiff argues that since defendant did not keep contemporaneous time sheets he cannot recover on his counterclaim.  While the lack of contemporaneous time records may be considered when estimating the fees to be paid out, such a lack is not an absolute bar to recovery.  Garcia, at *7 (citations omitted).

## V.  Estimating Recovery

Since the Court holds that defendant is entitled to recover attorney's fees under quantum meruit, the Court outlines briefly the factors to be considered in the event the parties choose to save themselves the expense of subsequent litigation.  When determining how much an attorney should recover in quantum meruit, the terms of the percentage agreement may be considered along with other factors such as the difficulty of the case, the time spent, the amount of money involved, the results achieved and amounts customarily charged for similar services in the same locality.  Smith, 192 A.D.2d, at 951.  See Garcia, supra, at *7.  See also Universal Acupuncture Pain Services, P.C. v. Quadrino & Schwartz, 370 F.3d 259, 264 (2d Cir. 2004) (noting other factors,

including (1) contingent nature of the work, (2) result achieved before discharge, and (3) client's actual chance of success at the time of discharge) (collecting cases).  Any evidence relevant to these factors can be submitted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment with respect to liability for attorney's fees in quantum meruit is granted.

The parties are to schedule a hearing before the Magistrate to whom the matter is referred to Report and Recommend the value of the legal services rendered.


SO ORDERED.


Dated:        July 25th, 2006
              Brooklyn, New York

                                        _____/s/_____
                                        I. Leo Glasser
                                        United States District Judge




A copy of the foregoing was sent electronically on this day to:

Todd J. Krouner
Law Office of Todd J. Krouner
93 North Greeley Avenue
Suite 100
Chappaqua, NY 10514

Attorney for Plaintiff


Ann Marie Forte
McManus, Collura & Richter, P.C.
48 Wall Street

25th Floor
New York, NY 10005

Attorneys for Defendant