UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
GABRIEL D'JAMOOS,

              Plaintiff,

    - against -

MICHAEL GRIFFITH,

              Defendant.
-------------------------------------------------X

**R E P O R T  A N D
RECOMMENDATION**

00 CV 1361 (ILG)

      In a decision dated July 25, 2006, the Honorable I. Leo Glasser issued an Order directing

the undersigned to prepare a Report and Recommendation on the question of attorney's fees

owed to defendant Michael Griffith for legal services he rendered to plaintiff Gabriel D'Jamoos

in connection with a commercial dispute. Plaintiff asserts that, for a variety of reasons,

defendant should not be awarded any fees whatsoever. Following a hearing held before this

Court on February 28, March 1, and March 2, 2007, and having considered both the pre-hearing

and post-hearing papers submitted by both parties, the Court respectfully recommends that

defendant Griffith be awarded $120,877.35 in fees and interest.


## FACTUAL AND PROCEDURAL BACKGROUND

      The factual background leading to this litigation is set forth more fully in the three

opinions issued by the district court on August 31, 2004, May 9, 2005, and July 25, 2006. For

purposes of this Report, the Court briefly summarizes the events leading to the current motion for

fees.

In 1986, plaintiff hired defendant Griffith, an attorney licensed to practice law in New York, to represent plaintiff in a commercial dispute between plaintiff and his brother-in-law, John Lucchese. According to plaintiff D'Jamoos, he had agreed to provide Lucchese with $175,000 as a capital contribution to several of Lucchese's businesses, entitling plaintiff to what he believed was a 50% interest in these businesses. (Aug. 31, 2004 Order at 1-2). Lucchese ultimately took the position that the money was merely a loan that did not entitle plaintiff to any ownership interest in the businesses. (Id.)

In the course of his dispute with Lucchese, plaintiff retained Griffith to represent him in an effort to resolve the dispute. (May 9, 2005 Order at 1). In 1986, D'Jamoos and Griffith entered into a retainer agreement whereby plaintiff agreed to pay Griffith an initial retainer fee, plus a per diem fee in the event of a trial, plus a 20% contingency fee based on "'settlement, trial or otherwise.'" (Id. at 1-2).

When efforts to resolve the dispute proved unsuccessful, Griffith commenced an action in July 1990, in New York State Supreme Court, Richmond County, against Lucchese and D'Jamoos's sister, Georgette Lucchese, Lucchese's former wife. (Aug. 31, 2004 Order at 3). The case proceeded to trial before the Honorable Joseph Maltese in February 1997. (Id.) During the trial, the parties reached a settlement which was placed on the record by counsel and which provided that Lucchese would give plaintiff $450,000 and a parcel of land on Staten Island (the "1997 settlement"). (Id. at 3-4). Counsel for Lucchese indicated that Georgette Lucchese, who had been previously dismissed from the case, would have to sign the stipulation of settlement. (Id. at 3, 4). Based on the advice of her divorce counsel, Ms. Lucchese never signed the stipulation of settlement and, because the settlement was never finalized, the parties appeared

2

once again before Justice Maltese in February 1998. (Id. at 4-5). After further negotiations, the parties advised the court on March 27, 1998, that a settlement had been reached in which plaintiff would obtain a 49% interest in one of the businesses, Belmont Realty Corp. ("Belmont"), without regard to the amount of plaintiff's investment (the "1998 settlement"). (Id. at 5).[1]

There were a number of conditions precedent that had to be fulfilled prior to the effectuation of the 1998 settlement. When those conditions precedent had not been met, D'Jamoos terminated the services of Griffith in December 1999, and proceeded to file a malpractice action against Griffith in this Court. (Id.) Plaintiff also moved to have Justice Maltese rescind the 1998 Settlement and reinstate the earlier agreement from 1997. (Id.) That motion was denied by Justice Maltese on June 16, 2000.

In plaintiff's first Amended Complaint against his attorney, he alleged that Griffith committed legal malpractice by negligently representing D'Jamoos in his dispute with Lucchese. Specifically, D'Jamoos criticized Griffith for failing to plead alternative claims, for delaying in bringing the Lucchese claim to trial, for failing to preserve certain evidence, for failing to properly evaluate D'Jamoos's damages, and for failing to consummate the prior 1997 settlement. (Id. at 9). D'Jamoos alleged that these acts, among others, had been the proximate cause of substantial monetary damages suffered by D'Jamoos. (Id. at 8-9).

In plaintiff's second Amended Complaint, D'Jamoos added claims for misconduct under N.Y. Judiciary Law § 487, for breach of fiduciary duty, and for common law fraud, based on Griffith's alleged failure to inform the state court that Griffith, subsequent to his representation

---

[1]Thereafter, in June 1998, a settlement was reached in the separate Lucchese divorce proceeding. (Id. at 6).

of D'Jamoos, had retained Lucchese's prior counsel, Ronald DeVito, to represent Griffith in an unrelated action. (Id. at 9). In response, defendant Griffith filed certain counterclaims seeking attorney's fees, which he claims were owed to him by D'Jamoos for services rendered.

By Order dated August 31, 2004, the district court granted summary judgment in favor of defendant, dismissing plaintiff's complaint in its entirety. Plaintiff thereafter moved to dismiss defendant's counterclaims for lack of subject matter jurisdiction. The district court denied D'Jamoos's motion to dismiss and referred the case to the undersigned to supervise discovery on the issues of attorney's fees.

By Notice of Motion dated October 18, 2005, defendant moved for summary judgment on his counterclaims seeking either the contingency fee set forth in the retainer agreement or, in the alternative, a fee based on quantum meruit. Plaintiff opposed the fee motion, arguing that defendant was discharged for cause and should receive no fees or, in the alternative, contending that defendant's motion for fees was barred by laches. The district court, after reviewing each of plaintiff's arguments, concluded that defendant was entitled to receive fees in quantum meruit, and referred the matter to the undersigned to issue a Report on the amount of fees to be awarded to Griffith. (See July 25, 2006 Order at 19-20).

## DISCUSSION

A. Discharge for Cause

Before determining the amount of fees to which defendant may be entitled under a quantum meruit calculation, the Court first considers plaintiff's contention that Griffith is not

entitled to any recover any legal fees. (See Pl.'s Mem.[2] at 1 (citing <u>Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.</u>, 370 F.3d 259 (2d Cir. 2004))). Specifically, plaintiff argues that Griffith's post-trial memorandum is "misleading," because the district court did not conclude that Griffith was entitled to an award of fees but merely noted at one point that Griffith only might be entitled to quantum meruit. (Id. (citing July 25, 2006 Order at 7-8 (holding that "[s]ince Griffith's representation of D'Jamoos had not yet been completed when he was discharged, he may only recover, if at all, through quantum meruit"))). Plaintiff contends that because the value of D'Jamoos's 49% interest in Belmont was worthless, Griffith was discharged for cause and therefore should receive no fees.

Having reviewed the plaintiff's argument as well as the proceedings before the district court, this Court concludes that plaintiff's argument was considered and rejected by the district court in granting defendant's motion for summary judgment on his counterclaims. The district court reviewed each of plaintiff's arguments, concluding that none "are sufficient grounds for a 'for cause' termination argument." (July 25, 2006 Order at 18). The district court also explicitly stated that "[s]ince the Court holds that defendant <u>is entitled to recover attorney's fees</u> under quantum meruit, the Court outlines briefly the factors to be considered . . . . " (Id. at 19 (emphasis added)). Thus, this Court has not considered plaintiff's "for cause" argument in this Report.

---

[2]Citations to "Pl.'s Mem." refer to Plaintiff's Post-Hearing Memorandum, dated April 20, 2007.

B. Quantum Meruit and Reconstruction of Time

Turning to the computation of fees under a theory of quantum meruit, the New York Court of Appeals has held that "a discharged attorney may recover the 'fair and reasonable value' of the services rendered . . . determined at the time of discharge and computed on the basis of quantum meruit." In re Cohen v. Grainger, Tesoriero & Bell, 81 N.Y.2d 655, 658, 622 N.E.2d 288, 290, 602 N.Y.S.2d 788, 790 (1993) (internal citations omitted). In determining a fixed dollar amount based on quantum meruit, the court can take into account the original retainer agreement, see Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C., 370 F.3d at 263; Tillman v. Komar, 259 N.Y. 133, 135, 181 N.E. 75, 75-76 (1932), and may consider the size of recovery. Cheng v. Modansky Leasing Co., 73 N.Y.2d 454, 459, 539 N.E.2d 570, 573, 541 N.Y.S.2d 742, 745 (1989). However, even where a retainer agreement assigns a portion of the proceeds of an action to counsel, "[w]hen the attorney-client relationship is terminated in the midst of the attorney's representation, counsel's entitlement to fees is no longer governed by the terms of the retainer agreement." Casper v. Lew Lieberbaum & Co., Inc., No. 97 CV 3016, 1999 WL 335334, at *5 (S.D.N.Y. May 26, 1999). Instead, the attorney may be allowed a charging lien upon any proceeds of the lawsuit, to be determined on a quantum meruit basis once the case is concluded. Id. at 5-7; see also People v. Keeffe, 50 N.Y.2d 149, 156-57, 405 N.E.2d 1012, 1015, 428 N.Y.S.2d 446, 450 (1980). If there are no proceeds from the lawsuit, any recovery by the attorney will simply be determined by the reasonable value of the attorney's services. See, e.g., Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C., 370 F.3d at 264 (noting that attorney's fees in quantum meruit are not contingent upon a monetary recovery).

The law is clear that the party seeking fees bears the burden of proof. See Dweck Law

Firm, L.L.P. v. Mann, No. 03 CV 8967, 2004 WL 2202587, at *2 (S.D.N.Y. Sept. 30, 2004). When determining fees on a quantum meruit basis, the courts have outlined a number of factors to consider. These include: "'(1) the difficulty of the matter; (2) the nature and extent of the services rendered; (3) the time reasonably expended on those services; (4) the quality of performance by counsel; (5) the qualifications of counsel; (6) the amount at issue; and (7) the results obtained.'" Garcia v. Teitler, No. 04 CV 832, 2004 WL 1636982, at *7 (E.D.N.Y. July 22, 2004) (quoting Casper v. Lew Lieberbaum & Co., Inc., 182 F. Supp. 2d 342, 346 (S.D.N.Y. 2002)), aff'd, 443 F.3d 202 (2d Cir. 2006); see also Sequa Corp. v. GBJ Corp., 156 F.3d 136, 148 (2d Cir. 1998). Other courts have formulated the factors to be considered as: "(1) time, (2) standing of the lawyer at the bar; (3) amount involved; (4) benefit to the client and (5) skill demanded." Paollilo v. Am. Exp. Isbrandsten Lines, Inc., 305 F. Supp. 250, 251 (S.D.N.Y. 1969). See also D.R. 2-106, N.Y. Comp. Codes R. & Regs., tit. 22 § 1200.11(b) (setting forth factors relevant to determining reasonableness of fee).

In calculating a reasonable attorney's fee in an action in diversity, courts may also apply the "lodestar" method in addition to considering the Garcia factors. See, e.g., Sequa Corp. v. GBJ Corp., 156 F.3d at 148-49 (upholding district court's calculation of attorney's fees based on analysis of quantum meruit factors and lodestar approach); Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 841 (2d Cir. 1993) (noting that courts may employ lodestar approach in determining fees in quantum meruit); Dweck Law Firm, L.L.P. v. Mann, No. 03 CV 8967, 2004 WL 1794486, at *3 (S.D.N.Y. Aug. 11, 2004) (noting that in calculating fees in quantum meruit, courts "may employ a 'lodestar' analysis"); Casper v. Lew Lieberbaum & Co., Inc., 182 F. Supp. 2d at 346 (applying relevant factors and lodestar analysis).

7

Under this approach, courts first determine a "lodestar" figure by multiplying the number of hours reasonably spent by counsel on the matter by a reasonable hourly rate. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1159 (2d Cir. 1994); F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d at 1263; Cowan v. Ernest Codelia, P.C., No. 98 CV 5548, 2001 WL 30501, at *7 (S.D.N.Y. Jan. 12, 2001). "While there is a strong presumption that this amount represents a reasonable fee," Cowan v. Ernest Codelia, P.C., 2001 WL 30501, at *7, this resulting "lodestar" figure can be adjusted upward or downward based on other considerations. See Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999). It is clear, however, that "'[t]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.'" Cruz v. Local Union No. 3, 34 F.3d at 1160 (quoting Hensley v. Eckerhart, 461 U.S. at 437).

Indeed, in connection with fee applications, courts generally require the party seeking fees to submit detailed records, listing the services rendered in connection with the action, the name of each attorney who worked on the matter, the date that services were performed, the hours spent in performing the services, and the hourly rate charged. See New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983) (holding that an attorney "who applies for court-ordered compensation . . . must document the application with contemporaneous time records . . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done"). It is clearly the attorney's burden to maintain contemporaneous records, see F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987), and fee applications are subject to denial where the fees have not been

adequately documented. See, e.g., Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992). In accordance with this approach, the Court first analyzes the number of hours claimed by Griffith and then addresses the rates charged.

### 1. Plaintiff's Objection Based on Lack of Records

Here, Griffith seeks fees for 484 hours of time spent over the course of the 13 years he represented D'Jamoos in his case against Lucchese. Mr. Griffith, however, testified that he had no record of the hours actually spent in connection with his work for D'Jamoos and that he did not generally maintain either contemporaneous time records or prepare invoices of time spent on his matters. (Tr.[3] at 238). Based on this testimony, plaintiff contends that Griffith should be denied fees because he has failed to keep contemporaneous time records. (Pl.'s Mem. at 1-2 (citing Dweck Law Firm, L.L.P. v. Mann, 2004 WL 2202587, at *2)).

The district court previously rejected that argument, noting that "[w]hile the lack of contemporaneous time records may be considered when estimating the fees to be paid out, such a lack is not an absolute bar to recovery." (See July 25, 2006 Order at 19 (citing Garcia v. Teitler, 2004 WL 1636982, at *7)). Although the absence of any documentation whatsoever as to hours spent on services performed in the underlying litigation compounds the already difficult task of assessing an appropriate fee in this case, the Court has nonetheless considered the defendant's testimony and the plaintiff's objections thereto in an effort to come to a reasonable fee given all of the circumstances.

---

[3]Citations to "Tr." refer to the transcript of the fee hearing held before this Court on February 28, March 1, and March 2, 2007.

2. Hours and Services Performed

Given the absence of detailed time records, Mr. Griffith attempted to reconstruct the time

expended on the D'Jamoos matter by examining his litigation file and various documents filed

with the Court. In preparation for the fee hearing, Griffith explained that he went through his

files, consisting of two redwelds of documents, and reviewed the documents contained therein to

re-create the work done in each period and prepare an estimate of time spent on these tasks.[4] (Tr.

at 244). He testified that he looked at the appropriate papers and made estimations based upon

his general practice with Mr. D'Jamoos's case and with other clients, estimating the amount of

time attributable to the preparation of each document. (Id. at 246). He then included this

information in a document, admitted at the hearing as Court Exhibit 1 ("Ex. 1"), listing the time

spent and a description of the work performed for each of the years he represented D'Jamoos.

(Id. at 247). For two years of the 13 years at issue, 1993 and 1995, Griffith makes no claim for

time expended in representing D'Jamoos despite his recollection that some work was in fact done

during those years. (Def.'s Mem.[5] at 11,12; Tr. at 296-97, 309).

For the remaining years, Griffith seeks fees in the following amounts broken down by

year:

| YEAR | HOURS SPENT |
|------|-------------|
| 1986 | 12.75 hours |
| 1987 | 18 hours |

---

[4]At the fee hearing, these redwelds were admitted into evidence as Plaintiff's Exhibits P
and Q.

[5]Citations to "Def.'s Mem." refer to defendant's Post-Hearing Memorandum, filed March
30, 2007.

| | |
|---|---|
| 1988 | 69.75 hours |
| 1989 | 6.5 hours |
| 1990 | 43.75 hours |
| 1991 | 36 hours |
| 1992 | 41 hours |
| 1993 | 0 hours |
| 1994 | 22.25 hours |
| 1995 | 0 hours |
| 1996 | 2 hours |
| 1997 | 164.5 hours |
| 1998 | 65.5 hours |
| 1999 | 2 hours |

(See Def.'s Mem. at 14).

C. Garcia Factors

In accordance with Garcia v. Teitler, 2004 WL 1636982, the Court has considered the relevant factors to be assessed in determining an award of fees on a quantum meruit basis.

1. Difficulty of the Matter

Plaintiff argues that even under the Garcia factors, Griffith should not be entitled to any fees. Under the first Garcia factor – the difficulty of the matter – plaintiff argues that his dispute with Lucchese was "neither difficult nor complex." (Pl.'s Mem. at 3). In support of this argument, plaintiff points out that originally, Griffith sought a contingency fee of only 10%, suggesting that if Griffith had believed the case was going to be challenging, he would have

sought a conventional one-third or even 40% contingency fee. (Id.) Plaintiff argues that "[s]uch a modest fee belies [Griffith's] claim that the case was difficult." (Id.) In addition, plaintiff testified that Griffith explicitly told him that the case would be "simple." (Id. (citing Tr. at 371)). The absence of a significant number of documents in the case file, including the absence of any legal research, correspondence, or notes concerning communications with D'Jamoos, is cited by plaintiff as additional evidence that the case was not particularly difficult or complex. (Id.)

Griffith disputes plaintiff's argument that the 10% contingency fee is a reflection of the complexity of the case. As an initial matter, Griffith contends that he never agreed to a 10% contingency fee; instead, he contends that the written retainer agreement submitted to the Court was what the parties intended to cover Griffith's fees in this case. (Def.'s Reply Mem.[6] at 4). That agreement provided for an initial retainer of $10,000, plus a contingent fee of 20% of any recovery, and a per diem trial fee. (See July 25, 2006 Order at 2).[7]

Regardless of which percentage fee was agreed upon or not, as noted supra at 6, the Court is not bound by that retainer agreement in setting a reasonable fee based on quantum meruit. See Casper v. Lew Lieberbaum & Co., Inc., 1999 WL 335334, at *5. Moreover, the Court credits Griffith's explanation that the case was complicated by the absence of evidence to support the plaintiff's claim that his contribution to Lucchese was intended to establish a partnership with Lucchese. (See Tr. at 256-57). There was no written partnership agreement, no stock certificates

---

[6]Citations to "Def.'s Reply Mem." refer to defendant's Post-Hearing Reply Memorandum, filed April 26, 2007.

[7]Although D'Jamoos testified about the asserted 10% retainer agreement (see Tr. at 370), D'Jamoos himself indicated that this agreement was not put into writing (id.), and Griffith claims this agreement has never been produced. (Def.'s Reply Mem. at 5). Since no such agreement was ever presented to this Court, the Court has not considered it in determining the fees here.

issued to plaintiff, nor was there any correspondence to suggest that the parties intended to establish a partnership. (Id. at 450). Indeed, plaintiff testified that he had no documentary evidence of his ownership interest in Belmont. (Id. at 448-49). Given the absence of any written documentation to support plaintiff's claim, proof of his position in the underlying litigation was problematic. The case was further complicated by the divorce proceedings that ensued between Lucchese and D'Jamoos's sister which prevented the initial settlement from being consummated.

2. Nature of the Legal Work Performed

Turning to the second factor, the nature and extent of the legal work performed by Griffith, plaintiff argues that there is a demonstrable absence of any evidence in Griffith's files to show that he expended significant effort in pursuing D'Jamoos's case. In addition to the lack of any correspondence or other documents reflecting counsel's research efforts, plaintiff contends that Griffith called only three witnesses at trial and that Griffith also failed to call any expert witnesses and failed to consummate the 1997 Settlement. (Pl.'s Mem. at 4). D'Jamoos criticizes Griffith for not taking additional depositions and for failing to propound document requests and interrogatories. (Id. at 7). Griffith is also criticized for not taking any action to consummate the 1998 Settlement.[8]

---

[8] D'Jamoos also argues that Griffith failed to pursue the claim that D'Jamoos's investment of $175,000 was a loan and that it was Griffith's fault that the matter languished for 13 years, contending that Griffith did nothing for the first three years. (Id. at 4, 10). These arguments were addressed by Judge Glasser in granting defendant's motion for summary judgment relating to plaintiff's claims. There, the judge found that because it was Lucchese's theory in defending against D'Jamoos in state court that the $175,000 was a loan, it was "unnecessary" for Griffith to raise this argument for D'Jamoos. In addition, the judge found that D'Jamoos had provided "absolutely no evidence" to support the claim that the delays were attributable to Griffith. (Aug. 31, 2004 Order at 12). The district court further found that there was no evidence that Griffith delayed commencement of the lawsuit, noting that the plaintiff appeared to encourage Griffith to settle the dispute rather than initiate the lawsuit. (Id. at 12-13). Since the plaintiff's arguments

In response, Griffith argues that the file alone does not reflect the amount of time and effort expended in pursuing D'Jamoos's interests. Although Griffith did not maintain extensive case files, he contends that he did take three depositions, participated in two separate trials, and spent numerous hours attempting to negotiate two settlement agreements. (Def.'s Mem. at 7). The Court finds that, especially in light of the relative complexity of the case, the nature of the work performed by Griffith conforms to what would reasonably be expected of an attorney in his position.

    3. Time Reasonably Spent

The third Garcia factor, the time reasonably spent on the services, is central to the parties' dispute.

    a. Asserted Legal Impediments

Plaintiff initially contends that there are two legal impediments to Griffith's claim based on hours spent. In this regard, plaintiff once again attempts to argue that given the fact that D'Jamoos had no reasonable expectation of recovering anything as a result of the lawsuit, Griffith should not receive any compensation for services rendered. (Pl.'s Mem. at 4). Specifically, at the hearing on fees held before this Court on March 1, 2007, plaintiff called Wayne Olson, an attorney and certified public accountant with the firm of Margolin Winer and Evens, where he serves as a tax partner. (Tr. at 197-98). Mr. Olson testified that in March of 2001, he was retained by D'Jamoos to perform an analysis of the cash flow to be expected and the tax consequences flowing from the acquisition of a 49% interest in Belmont. (Id. at 199-

_____

were previously addressed and disposed of by the district court, this Court has not considered them in rendering this Report and Recommendation.

14

200).[9] Based on his analysis, Mr. Olson opined that "there was no reasonable expectation of a recovery of a tangible economic benefit" as a result of D'Jamoos's acquisition of his interest in Belmont. (Id. at 201). This opinion was based on the alternative valuation of a parcel of property that was the sole asset held by Belmont which the parties stipulated was worth $3.5 million. (Id. at 202). Unfortunately, because there was a first mortgage on the property of approximately $2.5 million and additional loans and outstanding obligations, including a priority loan to Lucchese of $950,000, if the property had been sold for $3.5 million, there would have been no money available for distribution to the shareholders. (Id. at 203).

According to Mr. Olson, not only was there no value in the property, but because Belmont was a subchapter S corporation, there were "some significant negative tax consequences that could have and would have arisen for Mr. D'Jamoos had he acquired that interest and had the property been sold." (Id. at 205). Mr. Olson calculated that the negative tax consequences flowing from taxable gain that would have been reported upon the sale of the property amounted to $400,000. (Id. at 205-06). Even if the property had not been sold, Mr. Olson opined that the cash generated from rents and net operating income derived from the property would have been used first to pay off Lucchese's loan, leaving D'Jamoos with nothing. (Id. at 208-09). Mr. Olson also explained the consequences of being a minority shareholder with no voting control, no significant say in the management of the company, and a limited ability to sell shares. (Id. at 214).

Plaintiff argues that based on Mr. Olson's testimony, there was no reasonable expectation

---

[9]As a consequence of the negotiated 1998 Settlement, Mr. D'Jamoos received a 49% interest in Belmont, one of Lucchese's properties.

that D'Jamoos would recover anything as a result of the lawsuit and thus, as a matter of law, Griffith should be denied fees altogether. As noted above, the district court has rejected plaintiff's argument that the termination of Griffith's services was for cause. Since this argument – namely, that the settlement negotiated on behalf of D'Jamoos was essentially worthless – is simply another way of raising the "for cause termination" argument, the Court declines to consider it in assessing fees owed.

The second "impediment" to an award of fees cited by plaintiff is defendant's failure to comply with this Court's past orders directing Griffith to produce discovery regarding the amount of his fees. Plaintiff argues that only on the eve of the fee hearing did Griffith disclose his replication of his time charges, which plaintiff argues was "seriously prejudic[ial]." (Pl.'s Mem. at 5-6). Specifically, plaintiff points out that in 2002, during Griffith's deposition, he was asked to quantify his fees and was unable to do so. (Id. at 5).

In response, Griffith concedes that he did not maintain time records and could not quantify his fees in 2002 because at that time, he believed that he was going to be paid on a contingency basis. It was not until the issuance of Judge Glasser's decision ruling that reimbursement would be on a quantum meruit basis that Griffith tried to re-create the hours using the file and the customary methods used with other clients. (Tr. at 240). Moreover, he argues that plaintiff has failed to identify the manner in which plaintiff was prejudiced by the estimate of hours presented at the hearing. (Id.; Def.'s Mem. at 8).

As far as plaintiff's claim of prejudice is concerned, the Court notes that although plaintiff initially objected to the introduction of Exhibit 1, plaintiff later agreed to its admission into evidence (Tr. at 247-48); furthermore, plaintiff used it extensively to question Griffith on

cross-examination. As such, the Court finds that plaintiff's complaints do not constitute a bar to

any recovery by Griffith.

### b. Breakdown of Hours

Griffith argues that because he was forced to estimate the services he performed over the

period of his representation of D'Jamoos, the resulting time for which he seeks payment already

is less than the amount of work he actually performed. (Def.'s Mem. at 2). Defendant also notes

that although he performed services for his client during each of the thirteen years at issue, he

was forced to seek no compensation for two of those years, 1993 and 1995, because there was

nothing to refresh his memory as to the work he did during those years. (Id.) D'Jamoos,

however, cites Dweck in urging this Court to discount Griffith's fees because of his inability to

support his claim with time records. (Pl.'s Mem. at 7). In the event that the Court is inclined to

award any fees to Griffith, D'Jamoos raises specific objections to certain of Griffith's claims for

time, and, given that Griffith's only support for much of his fees was his "own flawed memory,"

plaintiff urges the Court to reduce his total requested fees by at least 20%. (See id. (citing

Monaghan v. SZS 33 Assocs., L.P., 154 F.R.D. 78, 84 (S.D.N.Y. 1994) (reducing fee in diversity

action by 30% for failure to maintain contemporaneous time records))).

### 1. Excessive Hours

The law is clear that when reviewing a fee application, the court "should exclude

excessive, redundant or otherwise unnecessary hours." Quaratino v. Tiffany & Co., 166 F.3d at

425 (citing Hensley v. Eckerhart, 461 U.S. at 433). Some courts have dealt with the problem

posed by excessive or redundant billing by simply subtracting the redundant hours from the

amount of hours used to calculate the lodestar. See, e.g., Fernandez v. North Shore Orthopedic

17

Surgery & Sports Med., P.C., No. 96 CV 4489, 2000 WL 130637, at *6 (E.D.N.Y. Feb. 4, 2000);

Ruggiero v. Krzeminski, 928 F.2d 558, 564-65 (2d Cir. 1991) (affirming the lower court's

decision to subtract 32 hours for irrelevant research and for work performed on post-trial

motions).

Here, where there are no specific billing records to review, the Court must, based on its

own experience, determine whether the attorney is seeking an excessive amount for the work

performed. This is in keeping with the Second Circuit's statement that the district court is not

required to "set forth item-by-item findings concerning what may be countless objections to

individual billing items." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994); see also

Daiwa Special Asset Corp. v. Desnick, No. 00 CV 3856, 2002 WL 31767817, at *5 (S.D.N.Y.

Dec. 3, 2002) (reducing fee request of $2.2 million by 50% due to "duplication of attorney

efforts, the overstaffing of meetings and depositions, and the inefficient allocation of human

resources"). "[I]t is less important that judges attain exactitude, than that they use their

experience with the case, as well as their experience with the practice of law, to assess the

reasonableness of the hours spent." Amato v. City of Saratoga Springs, 991 F. Supp. 62, 66

(N.D.N.Y. 1998) (citing Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992)). Thus, "[i]n

calculating the number of 'reasonable hours,' the court looks to 'its own familiarity with the case

. . . and its experience generally as well as to the evidentiary submissions and arguments of the

parties.'" Clarke v. Frank, 960 F.2d at 1153 (internal citation omitted).

Accordingly, some courts have used percentage reductions "as a practical means of

trimming fat from a fee application." New York State Ass'n for Retarded Children, Inc. v.

Carey, 711 F.2d at 1146 (finding percentage reductions to be an acceptable means for reducing

fee applications); see also Chernis v. Swarzman, No. 05 CV 3377, 2007 WL 2230078, at *13 (S.D.N.Y. Aug. 2, 2007) (reducing award by 20% "to ensure that the judgment entered in this case incorporates only the time that [the attorney] reasonably expended"); Levy v. Powell, No. 00 CV 4499, 2005 WL 1719972, at *7-9 (E.D.N.Y. July 22, 2005) (applying percentage reductions to various attorneys' fee requests); Tokyo Electron Ariz., Inc. v. Discreet Indus. Corp., 215 F.R.D. 60, 64-65 (E.D.N.Y. 2003) (applying 10% reduction to excessive fee application); Rotella v. Board of Educ. of City of New York, No. 01 CV 0434, 2002 WL 59106, at *3-4 (E.D.N.Y. Jan. 17, 2002) (applying percentage reduction to fees of several attorneys for excessive and redundant billing); Quinn v. Nassau County Police Dep't, 75 F. Supp. 2d 74, 78 (E.D.N.Y. 1999) (reducing one attorney's fees by 20% and another attorney's fees by 30% for unnecessary and redundant time).

Courts have also reduced fee awards where the billing entries were overly vague. See, e.g., F. H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d at 1265 (criticizing entries for "Rev. Docs" and "Clients re testimony"); Amato v. City of Saratoga Springs, 991 F. Supp. at 65-66 (reducing award for vagueness due to entries such as "review discovery response," "prepare deposition questions," and "review research"); Dailey v. Societe Generale, 915 F. Supp. 1315, 1328 (S.D.N.Y. 1996) (stating that entries such as "'telephone call,' 'consultation,' and 'review of documents' are not sufficiently specific so as to enable the Court to determine whether the hours billed were duplicative or excessive"), aff'd in part, vacated in part, 108 F.3d 451 (2d Cir. 1997); Pressman v. Estate of Steinvorth, 886 F. Supp. 365, 367-68 (S.D.N.Y. 1995) (denying compensation for entries such as "telephone conversation," "prepare correspondence," or "review of file" where no associated legal matter was specified); Orshan v. Macchiarola, 629 F. Supp.

19

1014, 1019-20 (E.D.N.Y. 1986) (reducing fees for such entries as "prepare correspondence" and "review correspondence").

Where the fee application contains numerous vague entries, courts routinely impose an across-the-board reduction. See, e.g., Aiello v. Town of Brookhaven, No. 94 CV 2622, 2005 WL 1397202, at *2-3 (E.D.N.Y. June 13, 2005) (applying 15% reduction to attorneys' fees where billing statements were "rife with vague entries"); Mr. X v. New York State Educ. Dep't, 20 F. Supp. 2d 561, 564 (S.D.N.Y. 1998) (reducing fee award by 20% to account for vague and duplicative time entries); DeVito v. Hempstead China Shop, Inc., 831 F. Supp. 1037, 1045 (E.D.N.Y. 1993) (reducing fee request by 40% due, in part, to insufficient descriptions of work performed).

Finally, courts reviewing claims for attorney's fees in quantum meruit have applied a percentage or other type of reduction where the attorney's claims are not adequately supported by contemporaneous time records. See, e.g., Mar Oil, S.A. v. Morrissey, 982 F.2d at 842 (holding that district court's assessment of time spent and rate charged when faced with claim for attorney's fees with little supporting documentation was excessive and remanding for reduction); Dweck Law Firm, L.L.P. v. Mann, 2004 WL 1794486, at *3 (reducing award of attorney's fees by 25% in light of attorney's acknowledgment that amount of hours worked was a mere "'guesstimate'").

Having reviewed Mr. Griffith's reconstruction of the work performed on behalf of Mr. D'Jamoos, the Court declines to recommend a 20% across-the-board reduction of the total amount of hours as urged by plaintiff. The Court finds that Griffith generally attempted in good faith to reconstruct the time spent based on his best recollection and whatever documents

20

remained to review in a casefile that, when the instant dispute arose, was already thirteen years old. Moreover, the Court also finds that this estimate may, in some instances, reflect fewer hours than he actually expended for his client. However, given the paucity of supporting documentation and the complete absence of any contemporaneous fee records, the Court respectfully recommends that the hours spent be reduced for certain years as detailed below.

### 2. Year-by-Year Analysis

The first entry in Griffith's reconstructed records is for 1986, for which Griffith seeks a total of 12.75 hours. His records initially reflect a half hour telephone call with D'Jamoos in the fall of that year. (Tr. at 253). Griffith conceded that he could not recall any specific dates for his initial meeting or phone call with D'Jamoos, nor did he have any notes of that first call. (Id. at 253-54). At the hearing, Griffith submitted an exhibit consisting of notes of Griffith's initial meeting with D'Jamoos in 1986. (Id. at 248-49). Based on his recollection, Griffith believed that he met with D'Jamoos on that first occasion for three hours. (Id. at 251). Griffith also submitted a copy of a newspaper article dated July 28, 1983, which Griffith believed D'Jamoos had provided to him at their initial meeting. (Id.) Although he could not recall whether this newspaper article was discussed at the initial meeting, Griffith specifically recalled discussing with D'Jamoos at this meeting the facts of the transaction, Griffith's request for authorization to engage in discovery, a review of correspondence from Lucchese's attorney, DeVito, including a proposed shareholders' agreement, and his attempts to settle the dispute amicably. (Id. at 252).

The second time entry in 1986 of .75 hours reflects a conversation with Richard Lorge, the attorney who, acting in conjunction with Griffith, assisted in drafting the complaint for D'Jamoos in the underlying action. Griffith admitted that apart from his notes of that

conversation, he had no specific recollection of any other topics discussed with Mr. Lorge. (Id. at 255). The remainder of the time sought by Griffith for 1986, 8.5 hours, pertains to 6.5 hours' worth of telephone conversations with D'Jamoos and DeVito, an hour-long discussion with Mr. Lorge, and an hour spent reviewing documents in preparation for a discussion with Mr. DeVito. Plaintiff argues that in the absence of any "real record" of the work Griffith performed in 1986, Griffith's recollection cannot be credited. (Pl.'s Mem. at 8).

The Court disagrees. Based on Griffith's testimony at the hearing and the supporting documentation submitted, the Court finds that the total amount of time requested for the year 1986 is reasonable.

With respect to the year 1987, Griffith seeks reimbursement for 18 hours of work for which he has submitted documentation supporting only two of those hours. Plaintiff argues that in the absence of records documenting work done by Griffith during this year, there is no "credible proof" to support Griffith's claim of 18 hours for that year. (Id.) According to Griffith, of the 18 hours of claimed, he spent 8 hours reviewing correspondence from DeVito and D'Jamoos and engaging in numerous conversations with Lorge, D'Jamoos, and Devito about the status of the dispute. Yet there are only three letters in his file documenting what was reviewed or discussed. In his testimony, he explained that an additional 10 hours were spent in meetings with D'Jamoos and with DeVito in an attempt to resolve the dispute without litigation. (Ex. 1).

Accordingly, for the year 1987, it is respectfully recommended that Griffith's requested hours be reduced by 15% to account for the lack of supporting documentation, for a total of 15.3 hours.

Similarly, for the year 1988, Mr. Griffith reimbursement for 69.75 hours spent on a

22

variety of tasks, including over 10 hours of discussions with Georgette Lucchese's attorney, over 11 hours of discussions with DeVito, and 24 hours of discussions with D'Jamoos with respect to the commencement of the action. (Id.) Griffith could not, however, recall what was actually discussed during this period prior to the filing of the action. In addition to the approximately 45 hours spent in discussions about the commencement of the action, the only other specific instances of services performed that he could recall during this period was travel from Long Island to view the property, and some legal research that was conducted on several issues. (Id.) There were, however, no documents, notes or any other written materials in the file to reflect the subjects of the research or the length of time spent. Moreover, plaintiff notes that Griffith took $5,000 out of the $10,000 retainer paid by D'Jamoos to pay Mr. Lorge to assist in drafting the initial complaint in the underlying matter. (Pl.'s Mem. at 8; Tr. at 113). This confirms that Griffith did not prepare the basic pleadings in the case, and plaintiff argues that it shows Griffith's complete lack of experience in civil litigation. He further questions the basis on which Griffith retained the remaining $5,000 "for work that he did not perform."[10]

Given the lack of supporting documentation for much of the time requested for this period, the Court respectfully recommends a reduction of 15% for the year 1988, for a total of 59.29 hours.

With respect to 1989, Griffith seeks payment for 6.5 hours of work, primarily for various telephone conversations with D'Jamoos, DeVito, and Georgette Lucchese's counsel about Ms. Lucchese's role and position in the dispute. (Ex. 1). D'Jamoos argues that because there were

_____

[10]The Court notes that Griffith has subtracted the $10,000 retainer from his request for fees. (See Def.'s Mem. at 14).

only two letters in the case file, one written by Griffith and the other received from DeVito, Griffith should be limited to the 1.25 hours he claims to have spent relating to these letters. D'Jamoos argues that he should receive no compensation for the other 5.25 hours that he claims he spent on phone calls, about which he has no independent recollection. (Pl.'s Mem. at 8).

The Court finds, based on the procedural posture of the case during this period, that Griffith's estimate of a total of only 6.5 hours in conversations was eminently reasonable and no reduction is warranted.

In 1990, Griffith seeks compensation for 43.75 hours. Again, D'Jamoos argues that this amount is inflated. (Id.) Not only is there nothing other than Griffith's memory to show that he spent 11.5 hours on phone calls related to the case, but there is nothing to support his claim of 8 hours of preparation time for John Lucchese's deposition. (Id.) Nor is there any evidence in the form of notes or correspondence to support his claim of five hours spent discussing the complaint with Mr. Lorge. Plaintiff does not appear to dispute the remainder of the hours claimed by Griffith, however, and the Court notes that the vast majority of the time entries correspond to documents in Griffith's file.

Having reviewed the documents submitted in support of the time requested for this period, the Court finds that the claim for time spent is not unreasonable. The Court disagrees with plaintiff that 8 hours of preparation time and 11.5 hours of telephone conversations was excessive. Accordingly, no reduction is recommended for the year 1990.

With respect to 1991, plaintiff argues that Griffith offered no documents in support for his claim of 36 hours, except for the time spent deposing John Lucchese. (Id. at 9). For this year, however, Griffith remembered performing a number of additional services, including

24

drafting and filing court documents, participating in the depositions of D'Jamoos and Georgette Lucchese, and communicating on a regular basis with his client and with Mr. Lucchese's attorney. (Def.'s Mem. at 10). Furthermore, the vast majority of Griffith's time entries for this year are supported by documentation from his case file; the only entries that do not have corresponding documents are for time spent preparing for the depositions of Ms. Lucchese and of D'Jamoos, and for 1.5 hours' worth of phone calls to DeVito in relation to document requests. (Ex. 1).

This Court finds the time requested to be reasonable in light of the tasks undertaken during this period.

D'Jamoos does not appear to dispute the 41 hours claimed by Griffith for 1992. During this time, Griffith asserts that he did a variety of work, including attending court conferences, reviewing documents, and communicating with various individuals. (Id. at 11). As noted above, Griffith makes no claim for 1993.

In 1994, Griffith demonstrated that he prepared and filed a new note of issue after the court lost the original and that he attended a court conference. Plaintiff argues that given that these are the only two tasks for which Griffith has documentation, his claim of 22 hours for that year cannot be supported. (Pl.'s Mem. at 9). Furthermore, plaintiff intimates that Griffith was responsible for the lost note of issue (id.), but the Court credits Griffith's testimony that the original was in fact lost by the court and not Griffith. In addition, defendant asserts that both of these tasks required him to travel to the courthouse in Staten Island from his home on Long

Island, and that these trips took nine hours, including the time spent at court. (Tr. at 62; Ex. 1).[11]

Given that travel time is generally reimbursed at half the normal rate charged by the attorney, see, e.g., Luciano v. Olsten Corp., 925 F. Supp. 956, 965 (E.D.N.Y. 1996), aff'd, 109 F.3d 111 (2d Cir. 1997); Cruz v. Local Union No. 3, 34 F.3d at 1161, the Court recommends that the hours requested for travel time be reduced by 50%. In this instance, out of the 22 hours requested, the Court has allocated 12 hours of travel time for the two trips to the courthouse, based on counsel's testimony. Accounting for the 50% rate reduction, the total number of hours for travel is reduced to six, leaving 10 hours of time spent preparing and refiling the note of issue, making various phone calls and writing letters in connection with the note of issue, and attending a court conference. Recognizing that the preparation of a note of issue is not particularly time-consuming and there is no testimony that the court conference took more than a few hours, the Court respectfully recommends that the total time to be compensated for the year 1994 should be reduced to 15 hours total.

As noted above, Griffith makes no claim for 1995. For 1996, however, he seeks payment for two hours of work spent reviewing various letters and making phone calls in connection with those letters. (Ex. 1). D'Jamoos argues that Griffith "admitted that he performed no work" (Pl.'s Mem. at 9), but Griffith contends otherwise, and each of his time entries is supported by the

---

[11]D'Jamoos also raises an objection based on Griffith's allegedly excessive claims for travel time, citing the nine-hour trip as an example. (Pl.'s Mem. at 7). Although plaintiff concedes that under the terms of the second written retainer agreement, Griffith was entitled to receive reimbursement for travel expenses, plaintiff complains that Griffith never sought such reimbursement and thus "there was no reason for his client to think he would be responsible for his attorney's exorbitant travel time." (Id. at 8). Plaintiff's argument fails in light of the fact that Griffith was to be paid on contingency. In such an arrangement, any breakdown of hours spent, including time spent on travel, was likely not discussed by plaintiff and defendant, thus leading to the very dispute at issue.

relevant letters. In addition, Griffith asserts that although he could only reconstruct two hours for that year, he corresponded frequently with various individuals, including D'Jamoos and counsel for Mr. Lucchese. (Tr. at 67-68). Griffith characterized himself during this period as being "very generous in [his] time" to plaintiff, and that his estimate of two hours therefore likely represents less time than he actually worked. (Id.)

This Court agrees and recommends no reduction for the year 1996.

In 1997, Griffith seeks 164.5 hours. Griffith testified that, as a general matter, he spent 42.5 hours in preparation for trial, in addition to having performed numerous other trial-related services. (Id. at 69-70). D'Jamoos disputes the estimate, contending that there was nothing in the file to review, and Griffith had no trial notes or transcripts in the file. Since the trial lasted two days, plaintiff suggests 16 hours as a reasonable time for 1997. (Pl.'s Mem. at 9). Griffith's records, however, indicate that days spent at the courthouse on Staten Island involved lengthy travel to and from the courthouse, and that in addition to two days of trial, there were an additional three days spent at court relating to the settlement and another day spent there relating to a motion to quash a subpoena. (Ex. 1). The time spent preparing for trial, together with the time at court, amounts to close to 124.5 hours.

The Court concludes that although the total time spent on these trial-related tasks is reasonable, the time spent in travel to and from court should be compensated at a 50% reduced hourly rate. Given the Court's prior estimate of six hours per day in travel time, the Court has subtracted 18 hours from the 124.5 hours spent in court and in preparation for trial to reflect the travel time reduction, reducing this number of hours to 106.5.

With respect to the remainder of the time claimed, Griffith asserts that this time was spent

on numerous telephone calls relating to trial and settlement, reviewing and writing several letters, and attending a meeting with DeVito and Georgette Lucchese's counsel. (Id.) Griffith was only able to provide three letters corresponding to this claim. Without any further documentation, the Court finds that the additional 40 hours requested is excessive in light of the descriptions provided and respectfully recommends a 20% reduction in that time, for a reduction of 8 hours, leaving a total for this year of 138.5 hours.

In 1998, Griffith seeks 65.5 hours, including time spent on the preparation and negotiation of the 1998 Settlement Agreement. D'Jamoos argues that Griffith "was profoundly ignorant of its terms" and "[e]qually shocking is that a copy of the 1998 Agreement was not even part of his file." (Id.) Complaining that Griffith did not understand the value and structure of Belmont nor explain the negotiations leading up to the 1998 Agreement, D'Jamoos contends that Griffith did nothing to deserve the requested time charge for that year and that his services "created no value." (Id. at 9-10).[12] Defendant, on the other hand, asserts that he made numerous court appearances and engaged in numerous negotiations relating to the underlying action, including preparing for a possible second trial, and discussions relating to the Lucchese divorce action. (Def.'s Mem. at 13). The Court notes that the overwhelming majority of his time entries for this year correspond to documents in his file.

With respect to the final year, 1999, for which Griffith seeks reimbursement for two hours of time, plaintiff argues that Griffith should not be entitled to recover for the one phone call he made which had nothing to do with informing D'Jamoos about the case, but which was

---

[12]To the extent that plaintiff again attempts to raise the "for cause termination" argument, the Court notes that he is barred from doing so. (See discussion supra at pp. 4-5, 14-16).

limited to Griffith's concerns about getting his fees paid. (Pl.'s Mem. at 10). The Court finds the time requested for this year to be reasonable.

Accordingly, having reduced the total number of hours requested from 484 hours in accordance with the discussion herein, the Court respectfully recommends that Griffith be compensated for 437.59 hours at the rates discussed infra at pp. 35-38.

    4. Quality of Performance

D'Jamoos also criticizes the quality of Griffith's performance, the fourth factor in the Garcia analysis. He criticizes Griffith for "squander[ing]" the first three years and not commencing the litigation earlier, and for not pursuing an alternative argument based on the monies being a loan. (Pl.'s Mem. at 10). The Court notes that these contentions have already been addressed and found meritless by the district court in its order granting Griffith's motion for summary judgment relating to plaintiff's claims. (Aug. 31, 2004 Order at 12-13; see also discussion at p. 13 n.8, supra). As such, as is the case with plaintiff's reargument of the "for cause termination" issue, the Court declines to address these arguments again.

D'Jamoos then contends that there is nothing in the record to support Griffith's contention that the 1997 Settlement failed due to the lack of Georgette Lucchese's consent. (Pl.'s Mem. at 11-12). Instead, D'Jamoos claims that the Agreement failed because of Griffith's "ineptitude." (Id. at 12). Plaintiff, however, never explains what it is that Griffith could or should have done to secure the settlement. Furthermore, the Court notes that this issue was also addressed by the district court in its order granting defendant summary judgment, in which the court found that the 1997 Settlement failed because Georgette Lucchese never consented to it, and rejected plaintiff's belated attempt to demonstrate that she had signed the Settlement. (Aug.

29

31, 2004 Order at 14-15). Further, the district court held that D'Jamoos's "subsequent endorsement of the 1998 Settlement . . . belies any complaint he might have had" about the 1997 Settlement. (July 25, 2006 Order at 14). Again, because this issue has been addressed by the district court, the Court will not address it here.

Finally, D'Jamoos argues that Griffith was deficient in that he did not understand the workings of the 1998 Settlement, which was not included as part of Griffith's case file, and that Griffith failed to consummate that second settlement on behalf of his client. (Pl.'s Mem. at 12-13). In response, Griffith argues that D'Jamoos had no "rational basis" on which to reject the stock tender he was to receive pursuant to the 1998 Settlement, and that contrary to plaintiff's assertions, the settlement had value to D'Jamoos. (Def.'s Reply Mem. at 8).

While the Court is troubled by the paucity of documents and records in Griffith's files, particularly the absence of a copy of the 1998 Settlement, the Court does not agree that plaintiff's concerns rise to the level of malpractice as urged by plaintiff. First, the district court noted that Griffith previously indicated that he had advised D'Jamoos to consult experts in the areas of tax and real estate management in relation to the 1998 Settlement. (Aug. 31, 2004 Order at 6; see also Tr. at 187-193). The district court also found D'Jamoos to be a "sophisticated businessman who had the ability to assess the settlement's consequences," and noted that D'Jamoos assured Justice Maltese that he understood the 1998 Settlement. (Aug. 31, 2004 Order at 13). In addition, the Court credits Griffith's representations that the 1998 Settlement represented almost exactly what his client sought to resolve the dispute, namely, a 50% interest in Belmont. (See Tr. at 325-28). While Griffith could perhaps have pushed his client harder to consult with an accountant or other experts to discuss the ramifications of the 1998 Settlement, the Court finds

that especially in light of D'Jamoos's familiarity with Belmont, given his position as bookkeeper there (see Aug. 31, 2004 Order at 2), Griffith's services in relation to the 1998 Settlement were perfectly adequate.

5. Qualifications of Counsel

The parties engage in minor disputes over Mr. Griffith's qualifications, the fifth Garcia factor. The Court finds, however, that the more important issue to be considered is that of the rates charged by Griffith in connection with the fee dispute. Griffith recalled that he charged the following rates: for the period from 1986 to 1989, $350 per hour; from 1990 to 1994, $375 per hour; and from 1996 to 1999, $385 per hour. (Def.'s Mem. at 14). Griffith has supplied no supporting documentation, however, to demonstrate that these are in fact the rates he charged, or that these rates are in line with those charged by similarly situated attorneys during the relevant periods.

The ultimate determination in a request for attorney's fees is whether, considering all of the circumstances, the fee requested is "reasonable." See Hensley v. Eckerhart, 461 U.S. at 433-37; D.R. 2-106, N.Y. Comp. Codes R. & Regs., tit. 22 § 1200.11(b). However, "[t]he focus of the district courts is no longer on calculating a reasonable *fee*, but rather on setting a reasonable *hourly rate*, taking account of all case-specific variables." Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110, 117 (2d Cir. 2007) (emphasis in original); see also D.R. 2-106, N.Y. Comp. Codes R. & Regs., tit. 22 § 1200.11(b)(3) (listing the "fee customarily charged in the locality for similar legal services" as one of the factors to be

considered in assessing the reasonableness of a fee).[13]

Neither party has addressed this issue, but the Court, in recommending a "reasonable" fee, has an obligation to review the rates charged to ensure that they are "'in line with those [rates] prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation.'" Cruz v. Local Union No. 3, 34 F.3d at 1159 (quoting Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)) (alteration in original); see also D.R. 2-106, N.Y. Comp. Codes R. & Regs., tit. 22 § 1200.11(b)(3). Indeed, the Second Circuit has held that the rates used to calculate the "lodestar" must be in line with those rates prevailing in "'the district in which the court sits.'" Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997) (quoting Polk v. New York State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983)); see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 369 F.3d 91, 95–96 (2d Cir. 2004). At the same time, however, the Second Circuit has made it clear that "[a] district court's 'choice of rates [is] well within [its] discretion.'" Cruz v. Local Union No. 3, 34 F.3d at 1160 (quoting Cabrera v. Jakabovitz, 24 F.3d 372, 393 (2d Cir. 1994)).

The Second Circuit has indicated that courts may consider evidence of prevailing rates for similar services beyond the fee application itself. See Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1059 (2d Cir. 1989). In addition to the parties' evidentiary submissions, the Court may also consider its own experience and familiarity with the case and with rates generally charged. However, as the court noted in Blum v. Stenson:

---

[13]As noted in the discussion at p. 7, supra, the Second Circuit has upheld the use of the lodestar approach in determining an award of attorney's fees in quantum meruit. See Sequa Corp. v. GBJ Corp., 156 F.3d at 148-49 (agreeing with the magistrate judge that "'the lodestar approach is sufficiently congruent with the criteria applicable under New York law to justify such a choice' of calculation methodology").

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

465 U.S. at 895 n.11.

One factor considered by the courts as evidence of a reasonable rate is the rate paid by counsel's fee-paying clients. Missouri v. Jenkins, 491 U.S. 274, 286 (1989); Crescent Publ'g Group, Inc. v. Playboy Enters., 246 F.3d 142, 151 (2d Cir. 2001); Luciano v. Olsten Corp., 925 F. Supp. at 962. Here, Griffith has not presented any evidence to support a conclusion that the fee rates requested are based on rates normally paid by his fee-paying clients, which would provide "a strong indication of what private parties believe is the 'reasonable' fee." Crescent Publ'g Corp., Inc. v. Playboy Enters., 246 F.3d at 151. However, the Court may look to what a reasonable paying client would be willing to pay in determining the "presumptively reasonable fee." Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d at 117-18. In doing so, courts are directed to consider, inter alia:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. at 114 (internal citation omitted); see also Warner Bros. Entm't, Inc. v. Carsagno, No. 06 CV 2676, 2007 WL 1655666, at *7 (E.D.N.Y June 4, 2007) (applying some of these Arbor Hill

factors).

Courts are also instructed to balance:

> the complexity and difficulty of the case, the available expertise and
> capacity of the client's other counsel (if any), the resources required
> to prosecute the case effectively . . . , the timing demands of the case,
> whether the attorney had an interest (independent of that of his client)
> in achieving the ends of the litigation or initiated the representation
> himself, whether the attorney was initially acting pro bono . . . , and
> other returns (such as reputation, etc.) the attorney expected from the
> representation.

Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d at 112; see

also Heng Chan v. Sung Yue Tung Corp., No. 03 CV 6048, 2007 WL 1373118, at *2 (S.D.N.Y.

May 8, 2007).

In determining an appropriate rate, the Court may consider its own experience and

familiarity with the prevailing rates in the community through the numerous fee applications

reviewed by this Court. See Assoc. for Retarded Citizens of Conn., Inc. v. Thorne, 68 F.3d 547,

554 (2d Cir. 1995) (holding that "a [court] may 'rely in part on [its] own knowledge of private

firm hourly rates in the community'") (quoting Miele v. New York State Teamsters Conference

Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987)). Having reviewed other attorneys' fee

applications arising in this district, it is clear that the range of "reasonable" attorneys' fee rates

varies depending on the type of case, the nature of the litigation, the size of the firm, and the

expertise of its attorneys.[14]

---

[14]Although the relevant market for evaluating the reasonableness of an attorney's fee has
been described as the Eastern District of New York, cases in the Eastern District have recognized
that "it is not improper or unreasonable to apply Southern District rates to litigation in this
district, at the judge's discretion, even if the litigation has taken place not in Brooklyn, a borough
of New York City, but in Central Islip, a satellite courthouse of the Eastern District." Tokyo
Electron Ariz., Inc. v. Discreet Indus. Corp., 215 F.R.D. 60, 63 (E.D.N.Y. 2003).

In the period in question, 1986 through 1999, rates have varied significantly. The Court

has determined that Griffith's rates should be divided into three periods, roughly delineated by

the nature of the work performed by Griffith during each period. The first period, 1986-1989,

encompasses the time before the commencement of the underlying action when Griffith was

primarily engaged in attempting to settle the dispute informally. During the second period, 1990-

1996, Griffith undertook work that was, on a whole, more demanding and complicated, including

preparing for and conducting depositions and attending various court conferences. Finally, the

third period, 1997-1999, includes the period when the action went to trial and during which

Griffith negotiated two settlement agreements.[15]

The rates requested by Griffith during the first period at issue appear to be exceptionally

high for an attorney in his position at the relevant time. See, e.g., Harb v. Gallagher, 131 F.R.D.

381, 386 n.5 (S.D.N.Y. 1990) (noting that prevailing rates at large New York City law firms in

1987 were from $210-$350 per hour for "High Partners" and from $140-$200 for "Low

Partners"); Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 715-16 (E.D.N.Y. 1989)

(awarding $275 per hour to services performed by experienced sole practitioner in complex

---

[15]The Court notes that a line of cases exists holding that when determining an award of attorney's fees for services provided over a number of years, a court should apply current, rather than historic, rates to compensate for the delay in payment. See, e.g., Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998) (holding that rates used to calculate lodestar in civil rights cases "should be 'current rather than historic hourly rates'" (citing Missouri v. Jenkins, 491 U.S. at 284)). However, the vast majority of these cases appear to have been decided under federal statutory provisions providing for attorney's fees, and are not dispositive of the current dispute, which arises in diversity and is governed by New York law. Furthermore, the Court has determined that as a claimant in quantum meruit under New York law, Griffith is entitled to prejudgment interest on his claim, which serves to alleviate any concern about delay in payment. See N.Y. C.P.L.R. § 5001; see also discussion at pp. 39-40, infra. As such, the Court has set Griffith's rates in accordance with those prevailing over the course of his representation of D'Jamoos.

securities action from 1987-1989). Griffith requests rates higher than these, even though he was not associated with a large firm; nor was the underlying dispute of the same level of complexity or difficulty as a complex securities action. More appropriate to the dispute at issue and the nature of Griffith's practice are the rates documented in such cases as Palermo v. Board of Educ., Bayport-Blue Point Union Free Sch. Dist., No. 87 CV 2960, 1989 WL 35938, at *3 (E.D.N.Y. Apr. 3, 1989) (noting that awards for attorneys practicing in small firms on Long Island ranged from $100-$150 for associates and $150-$250 for partners); Matter of Cena's Fine Furniture, Inc., 109 B.R. 575, 583 (E.D.N.Y. 1990) (approving rates of $180-$275 for partners and $100-$175 for associates of small firm for services between 1986 and 1989); Richards v. New York City Board of Educ, No. 83 CV 7621, 1988 WL 70209, at *6 (S.D.N.Y. June 27, 1988) (awarding $185 per hour for trial work and $100 per hour for non-trial work to 1969 law school graduate in a medium-sized firm for work performed between 1984-1986); and Petramale v. Local No. 17 of Laborers' Int'l Union of N. Am., No. 81 CV 4817, 1992 WL 212605, at *8 (S.D.N.Y. Aug. 25, 1992) (awarding, as rate prevailing in 1989, $150 per hour to 1973 graduate sole general practitioner with no expertise in relevant area of law). The Court finds that given Griffith's status as a sole practitioner with admittedly little legal expertise in area of the underlying dispute, along with the relative simplicity of the tasks undertaken during the relevant period, a rate of $150 per hour is appropriate for his work from 1986 to 1989. Griffith worked for 93.84 hours during this four-year period, which amounts to an award of $14,076.00.

Rates in New York City during the next period, from 1990 to 1996, vary widely as well. See, e.g., Luciano v. Olsten Corp., 925 F. Supp. at 963 (awarding $225 per hour to experienced attorney with expertise in area of law for work between 1993 and 1996); Jennette v. City of New

York, 800 F. Supp. 1165, 1169 (S.D.N.Y. 1992) (awarding $200 per hour for sole practitioner

with 10 years' experience litigating civil rights claims for services rendered from 1989-1992);

Perdue v. City University of New York; 13 F. Supp. 2d 326, 344-45 (E.D.N.Y. 1998) (reducing

requested rates to between $200-$225 for partners for work beginning in 1993); Stryker Corp. v.

Intermedics Orthopedics, Inc., 898 F. Supp. 116, 126 (E.D.N.Y. 1995) (reducing requested rates

to $200 per hour for partners for work between 1990 and 1995); Pearson v. Coughlin, No. 92 CV

1869, 1995 WL 366463, at *5 (S.D.N.Y. June 20, 1995) (awarding sole practitioner with 11

years' experience in civil and criminal litigation his requested rate of $150 per hour for matters in

1994 and 1995). The Court notes that although the second period encompasses a fair number of

years, the bulk of Griffith's work was performed from 1990 to 1992. As such, again considering

the nature of the work done and Griffith's background, the Court finds that the rates in the above-

cited cases generally applied to attorneys with more experience in the relevant area of law who

worked in larger offices, and that a rate of $175 per hour is appropriate for this period.

Multiplied by the 137.75 hours he worked over the six year period from 1990 to 1996, this

amounts to $24,106.25.

Next, the Court finds that for the period encompassing the trial and subsequent settlement

activities in the underlying dispute, from 1997 to 1999, Griffith should be compensated at a rate

of $200 per hour. See, e.g., Connor v. Ulrich, 153 F. Supp. 2d 199, 203 (E.D.N.Y. 2001)

(reducing requested rates for partners to $200 per hour for partners for work between 1999 and

2001); Schwartz v. Chan, 142 F. Supp. 2d 325, 331-32 (E.D.N.Y. 2001) (finding rate of $175 per

hour reasonable for sole practitioner in case that was "not complex"); Laster v. Cole, No. 99 CV

2837, 2000 WL 863463, at *2 (E.D.N.Y. June 23, 2000) (finding $200 per hour reasonable for

sole practitioner); <u>Paulino v. Upper West Side Parking Garage, Inc.</u>, No. 96 CV 4910, 1999 WL 325363, at *4 (S.D.N.Y. May 20, 1999) (awarding sole practitioner $200 per hour for "non-appearance work" and $250 per hour for "appearance work" for services rendered between 1996 and 1999); <u>Bick v. City of New York</u>, No. 95 CV 8781, 1998 WL 190283, at *28-29 (S.D.N.Y. Apr. 21, 1998) (reducing requested rates as excessive and awarding $250 per hour for sole practitioner with 20 years of experience in the related field and for a partner in a small firm with 12 years' experience). Using the rate of $200 per hour, the amount billed for the 206 hours he worked during the years 1997 to 1999 totals $41,200.00.

As such, the Court respectfully recommends that Mr. Griffith be awarded $79,382.25 in attorney's fees, less the $10,000 retainer, for a total of $69,382.25.

6. <u>Remaining Garcia Factors</u>

The parties raise various arguments with respect to the remaining <u>Garcia</u> factors, the amount at issue and the results obtained, with plaintiff contending that his share of Belmont was worth nothing, and that Griffith accordingly obtained "no tangible benefit whatsoever" for his client. (Pl.'s Mem. at 15-16). Griffith notes that the parties stipulated that the value of Belmont was $3.5 million and argues that D'Jamoos's decision to refuse tender of the stock he was to receive pursuant to the 1998 Settlement was based on his own misunderstanding of the stock's value. (Def.'s Mem. at 6; Def.'s Reply Mem. at 8). The Court finds that the remaining <u>Garcia</u> factors have been adequately addressed in the foregoing discussions about discharge for cause, the time reasonably spent by Griffith in the underlying action, and Griffith's qualifications. As such, the Court declines to address them again.

D. Award of Interest

As noted in the discussion at p. 35 n.15, supra, Griffith is entitled under New York law to prejudgment interest on his claim for attorney's fees. See N.Y. C.P.L.R. § 5001; see also Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf, 241 F.R.D. 451, 456-57 (S.D.N.Y. 2007); Chernis v. Swarzman, 2007 WL 2230078, at *13;[16] Dweck Law Firm, L.L.P. v. Mann, 2004 WL 1794486, at *4. D'Jamoos does not dispute that § 5001 applies, but takes issue with the date from which Griffith seeks to have interest awarded. (Pl.'s Mem. at 17). D'Jamoos claims that as no demand was made for payment, the earliest date from which interest can run is the date of the conclusion of the hearing before this Court, as that was the first time that Griffith quantified the fees sought. (Id.) Griffith, in turn, seeks to have interest awarded from the date of his termination. (Def.'s Reply Mem. at 11 (citing Dweck Law Firm, L.L.P. v. Mann, 2004 WL 2202587)).

The relevant provision of C.P.L.R. § 5001 provides that interest shall run "from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). Courts in the Second Circuit and New York courts are in disagreement as to whether this date is properly deemed to be the date of an attorney's discharge or the date the attorney first demanded payment. Compare Dweck Law Firm, L.L.P. v. Mann, 2004 WL 2202587, at *1 and Ash & Miller v. Freedman, 114 A.D.2d 823, 824, 495 N.Y.S.2d 183, 184 (1st Dep't 1985) (awarding interest

---

[16]The Court notes that although the Chernis and other courts have found awards of interest in quantum meruit claims to be discretionary, the Chernis court declined to award interest based on several factors not at issue here. See 2007 WL 2230078, at *14 (criticizing attorney seeking interest for failure to inform client about certain legal ramifications and method of billing). Given the distinction between that case and the one at bar, and in light of the numerous other decisions awarding interest, the Court opts to award interest in this case.

39

from date of discharge), with Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. 714, 721 (S.D.N.Y. 1986) and Brent v. Keesler, 32 A.D.2d 804, 805, 302 N.Y.S.2d 349, 351 (2d Dep't 1969) (finding that interest runs from date of demand for payment).

The Court finds persuasive the more recent set of cases holding that interest is properly awarded from the date of discharge. Especially in light of D'Jamoos's testimony that one of his last conversations with Griffith was on the subject of Griffith's payment (Tr. at 385), and that Griffith was terminated shortly thereafter, the "earliest ascertainable date" that Griffith's cause of action for payment arose can reasonably be set at his termination. See Dweck Law Firm, L.L.P. v. Mann, 2004 WL 2202587, at *1 (finding that cause of action arose when client discharged attorney following dispute about fee). Given that the Court has reduced the rate at which Griffith is to be repaid, however, the amount of interest must also be recalculated. Interest per annum on $69,382.25, at 9% under N.Y. C.P.L.R. § 5004, amounts to $6,244.40. Multiplied by the eight years between December 1, 1999 and December 1, 2007, this amounts to $49,955.20. Interest between December 1, 2007 and February 28, 2008, the date of this Report and Recommendation, 90 days at $17.11 per day, amounts to $1,539.90. The total amount of interest is $51,495.10.[17]


## CONCLUSION

In accordance with the foregoing, the Court respectfully recommends that defendant be awarded $69,382.25 in attorney's fees and $51,495.10 in interest, for a total award of $120,877.35.

---

[17]The Court respectfully recommends that additional interest be awarded for the period between the date of this Report and the date of its adoption.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b); Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
    February 28, 2008

Cheryl L. Pollak
United States Magistrate Judge