UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
GABRIEL D'JAMOOS,

                      Plaintiff,                  MEMORANDUM AND ORDER
                                                              00 CV 1361 (ILG)
    -against-

MICHAEL GRIFFITH,

                      Defendant.
--------------------------------------------------x

GLASSER, United States Senior District Judge:

## **INTRODUCTION**

In 2000, Plaintiff Gabriel D'Jamoos ("D'Jamoos" or "Plaintiff") filed an action for malpractice against his former attorney, Michael Griffith, Esq. ("Griffith"), and Griffith counterclaimed to recover the cost of the legal services he rendered to D'Jamoos. This Court, in an opinion dated July 25, 2006 (the "2006 Order"), granted summary judgment to Griffith on his counterclaims, and determined that Griffith, who was retained on a contingency basis, was terminated without cause, thus permitting him to recover for the *quantum meruit* value of the legal services he rendered. See D'Jamoos v. Griffith, 00 CV 1361 (ILG), 2006 U.S. Dist. LEXIS 50757, at *11 (E.D.N.Y. July 25, 2006). The Court at that time referred the matter to Magistrate Judge Cheryl L. Pollack to conduct a fee hearing and issue a report and recommendation regarding the appropriate amount of attorneys' fees, if any, to which Griffith is entitled. Judge Pollack conducted a three-day hearing, and on February 28, 2008, she filed a report and recommendation (the "R&R") with this Court, recommending that Griffith be awarded

1

$69,382.25 in legal fees and $51,495.10 in interest.  See Docket No. 114.  D'Jamoos now objects to those findings and recommendations.

## BACKGROUND

Griffith was hired by D'Jamoos in 1986 to represent him in a commercial real estate dispute with his brother-in-law, John Lucchese.  D'Jamoos contended that, as a result of a $175,000 capital contribution he made to Lucchese's business, Belmont Realty Corp. ("Belmont"), he became Lucchese's business partner and owner of 50% of the stock of Belmont, which owns the St. George Theatre, an office building in Staten Island, New York, and a small parking lot near the theatre.

Unrelated but having a collateral effect on their dispute was an action for divorce commenced against Lucchese by D'Jamoos's sister, Georgette, in 1986.  An Order issued in that action stayed the transfer of marital assets, which included shares of Belmont.  That Order prohibited D'Jamoos from acquiring any assets in Belmont until a waiver of that prohibition was obtained.

In 1990, the attempted amicable resolution of the dispute having failed, D'Jamoos commenced an action against Lucchese in New York State Supreme Court, Richmond County.  In addition to the initial retainer fee, D'Jamoos agreed to pay Griffith a 20% contingency fee based on "settlement, trial, or otherwise."

In 1997, Lucchese and D'Jamoos entered into a settlement agreement by the terms of which Lucchese agreed that Belmont would pay D'Jamoos $450,000 as a full and final settlement of their dispute.  That agreement was never effectuated, however, because the waiver was never obtained.

In 1998, after consolidating D'Jamoos's action with the divorce action, the parties

2

proceeded to a joint trial and again entered into a settlement agreement. Pursuant to this settlement, D'Jamoos was to receive 49% of the shares of Belmont in addition to a small parcel of real estate, with the remaining shares going to Georgette.[1] The parties executed a shareholders' agreement along with a written stipulation of settlement on September 27, 1998, and those documents were later incorporated into the divorce judgment signed by Justice Maltese on March 18, 1999. The settlement was conditioned upon approval of Georgette and D'Jamoos as mortgagors by a lending institution, and upon zoning approval for a subdivision of the real estate parcels, which took over a year to accomplish. Transcript of Fee Hearing, dated February 28-March 2, 2007, ("Tr.") at 83:8-84:12, 85:2-3, 183:17-18.

On December 1, 1999, before the settlement was finalized and any shares of Belmont were tendered to D'Jamoos, he terminated Griffith's services and subsequently initiated his malpractice suit against him.[2] In the 2006 Order, this Court found that the termination did not rise to the level of "for cause" termination, and subsequently referred the matter to the magistrate to ascertain the correct monetary value

---

[1] Specifically, it was agreed that Lucchese would retain control of the theatre and parking lot, and the shares of Belmont, which would only include the office building, would be divided so that Georgette would receive 51% of the shares and D'Jamoos would receive 49% of the shares plus a small parcel of other real estate. Pursuant to the agreement, Georgette was to be paid $88,520 a year, or 10% of the annual cash flow from the office building, and Lucchese was to receive the other 90% of the cash flow to be applied to the monies owed to him by Belmont in the amount of $953,322. The agreement also provided that in the event of a sale of the office building, the first $700,000 would be paid to Georgette, then any balance owing Lucchese would be paid, and the remainder would be distributed between Georgette and D'Jamoos. D'Jamoos agreed that he would not receive any funds from Belmont until Lucchese's indebtedness was paid down to the amount of D'Jamoos's capital contribution.

[2] D'Jamoos, represented by new counsel, refused to finalize the 1998 settlement, and sought to reinstate the earlier settlement that had never been effectuated, which request Judge Maltese rejected. Georgette upon realizing that any ownership in Belmont would subject her to continuing relations with her soon-to-be ex-husband, decided that she should sell her shares to him. This arrangement would have resulted in D'Jamoos as a minority shareholder with Lucchese, instead of his sister, owning a majority of the shares. See Tr. at 327:11-328:3.

attributable to the services rendered by Griffith to D'Jamoos.  D'Jamoos, 2006 U.S. Dist. LEXIS 50757, at *31.

D'Jamoos asserts three main objections to the R&R.  First, D'Jamoos does not believe that Griffith should have been awarded any fees based on the testimony and expert report provided by Wayne Olson, a tax partner at Margolin, Weiner, and Evans, opining that the tax ramifications of any sale of the Belmont office building would have rendered D'Jamoos's interest in the property worthless, and therefore, because Griffith's efforts failed to achieve any tangible benefit for D'Jamoos, he should not be awarded any fees.  Second, because Griffith did not maintain contemporaneous time sheets, D'Jamoos argues that the calculations made by Judge Pollack were unsupported and excessive.  Third, to the extent Griffith is entitled to an award, D'Jamoos asserts that the Court used the wrong date in fixing interest.

Reviewing the case de novo, this Court finds that the R&R correctly summarized and applied the applicable case law in determining the amount of attorneys' fees to be awarded Griffith.  This Court adopts the R&R insofar as it properly breaks down the services provided by Griffith by year of representation and determines the appropriate hourly rate to be applied to the work performed during those years; however, the Court modifies the R&R to apply an overall 15% reduction to the time claimed by Griffith due to his lack of documentation and his delay in providing such documentation.  In addition, the Court adopts that part of the R&R calculating interest as running from the date of termination of services.

## DISCUSSION

### A. Standard of Review

The Magistrates Act, 28 U.S.C. § 636(b)(1)(A) ("Section 636"), permits a district court judge to "designate a magistrate . . . to hear and determine any pretrial matter pending before the court," excluding certain dispositive motions. Nonetheless, magistrate judges "may hear dispositive pretrial motions, [though] [t]he[y] may only submit proposed findings of fact and recommendations [to the district court judge] for disposition of the matter." Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990). If a party files objections to the report and recommendation, the district court must "determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). It may then "accept, reject, or modify" the report and recommendation. Id. In this context, motions for attorneys' fees are treated as "dispositive pretrial matter[s]." Fed. R. Civ. P. 54(d)(2)(D); Choudhury v. Barnhart, 04 Civ. 0142 (RJH)(AJP), 2005 U.S. Dist. LEXIS 23814, at *2 (S.D.N.Y. Oct. 11, 2005).

### B. Calculation of Fees

#### i. Garcia Factors

This Court found in 2006 that Griffith was discharged without cause. See D'Jamoos, 2006 U.S. Dist. LEXIS 50757, at *29. Under New York law, if an attorney is discharged without cause prior to the conclusion of a case, that attorney may recover either "(1) in quantum meruit, the fair and reasonable value of the services rendered, or (2) a contingent portion of the former client's ultimate recovery, but only if both of the parties have so agreed." Universal Acupuncture Pain Servs., P.C. v. Quadrino &

Schwartz, P.C., 370 F.3d 259, 263 (2d Cir. 2004). Despite Plaintiff's view to the contrary, even where there is no ultimate monetary recovery by the client, a discharged attorney may still recover in *quantum meruit* for the services he rendered. See id. at 264 ("It follows that a discharged attorney's recovery in *quantum meruit* for a fee is not limited by the former client's ultimate recovery . . . [a]nd it follows that a court ought not to consider the former client's actual recovery in determining quantum meruit fees.").[3]

In determining the appropriate amount of fees to award, New York courts instruct a district court to consider "(1) the contingent nature of the representation, (2) the results achieved by the attorney before discharge, and (3) the client's actual chance of success at the time the attorney was discharged." Id. at 265 (internal citations omitted). Courts in this Circuit also consider "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained . . . ." Sequa Corp. v. GBJ. Corp., 156 F.3d 136, 148 (2d Cir. 1998) (referred to in the R&R as the Garcia factors, citing Garcia v. Teitler, 04 CV 832 (JG), 2004 WL 1636982, at *7 (E.D.N.Y. July 22, 2004)).

The Court agrees with the R&R's findings regarding the applicable Garcia factors. Many factors outside of Griffith's control complicated his representation of D'Jamoos. As observed by this Court in 2006, no evidence has been offered that the prolonged

---

[3] The R&R was also correct not to reconsider Plaintiff's argument that because the value of D'Jamoos's interest in Belmont was worthless, Griffith was discharged for cause and therefore should not receive any fees. That argument was already considered and rejected by this Court. See D'Jamoos, 2006 U.S. Dist. LEXIS 50757, at *27 ("[A]ny failure to give D'Jamoos tax advice furnished no grounds for 'for cause' termination."). That this Court stated in the 2006 Order that Plaintiff should be permitted an opportunity to present testimony regarding the tax ramifications of the 1998 settlement merely reflected the Court's judgment that the magistrate judge should consider the circumstances of the overall representation in ascertaining fees.

6

delay between the initiation of the lawsuit against Lucchese and the trial date was the fault of Griffith. The Order staying the disposition of any marital property prevented an early resolution of the real estate dispute. Indeed, testimony elicited at the fee hearing showed that the fate of the real estate dispute was intimately connected to the fate of the divorce action. Not only was the first attempt at settlement in 1997 derailed by D'Jamoos's sister, but the second settlement in 1998 failed in part when, upon realizing that any ownership in Belmont would subject her to continuing relations with her soon-to-be ex-husband, Georgette decided that she should sell her shares to him, resulting in Lucchese, instead of D'Jamoos's sister, becoming the majority shareholder of Belmont. See Tr. at 327:11-328:3.

The record also reflects that D'Jamoos did not want to settle for anything less than 50% of the stock of Belmont, despite the fact that he possessed no documentary proof of ownership. Tr. at 450:1-17, 464:11-14. Thus, the results achieved by Griffith before his termination, a court-approved settlement for 49% of the shares of Belmont with D'Jamoos's sister maintaining the remaining shares, plus a parcel of other real estate, closely approximated the results desired by D'Jamoos.

D'Jamoos contends that Judge Pollack did not consider that the results obtained by Griffith were worthless because the settlement he negotiated had potential negative tax repercussions. During the fee hearing, D'Jamoos in fact offered testimony from a tax expert that D'Jamoos had "no reasonable expectation of a recovery of a tangible economic benefit" as a result of his acquisition of stock in Belmont. Pl. Br. at 3-4. It is evident that Judge Pollack considered Olson's testimony as part of her analysis, and the R&R summarizes his testimony at pages 14-15. In addressing the quality of Griffith's

7

performance, Judge Pollock found compelling the fact that Griffith advised D'Jamoos to consult specific experts that he recommended in the areas of tax and real estate management in connection with the 1998 settlement, and D'Jamoos refused to retain these persons. R&R at 30; Tr. at 188:1-22, 189:24-190:1, 344:5-8.

While D'Jamoos disputes that he ever received such advice from Griffith, this Court will defer to the credibility assessment made by Judge Pollock following the three-day hearing during which Griffith and D'Jamoos were subject to extensive examination. That D'Jamoos rejected such advice, despite the fact that he himself was a sophisticated businessman who "had the ability to assess the settlement's consequences," does not render Griffith's services worthless. D'Jamoos, 2006 U.S. Dist. LEXIS 50757, at *26-27. This Court agrees with Judge Pollack's conclusion that "[w]hile Griffith could perhaps have pushed his client harder to consult with an accountant or other experts to discuss the ramifications of the 1998 Settlement, the Court finds that especially in light of D'Jamoos's familiarity with Belmont, given his position as bookkeeper there, Griffith's services in relation to the 1998 Settlement were perfectly adequate." R&R at 30-31. Any failure to seek outside advice at the urging of counsel was to D'Jamoos's own detriment.[4]

Moreover, Olson's testimony does not convince the Court that the settlement agreement left D'Jamoos with nothing of value. Olson testified that his calculations

---

[4] That Judge Pollack wrote that "the Court does not agree that plaintiff's concerns rise to a level of malpractice as urged by plaintiff," is not dispositive of whether she took into account the appropriate criteria in awarding Griffith legal fees. While D'Jamoos is correct in pointing out that it would have been improper for the magistrate judge to make any determination of whether Griffith was liable for malpractice since that claim was dismissed on motion by Griffith for summary judgment, it appears that the R&R does nothing more than characterize D'Jamoos's interpretation of Griffith's services as amounting to malpractice. Even if the R&R erroneously refers to a different standard in assessing fees, which it does not, after reviewing the record de novo, this Court nonetheless finds that the R&R reached the appropriate conclusion – that the value of Griffith's services was not rendered worthless by the tax ramifications of the 1998 settlement.

8

were premised on the assumption that the property would be sold, and did not take into consideration any benefit that might accrue to D'Jamoos in the form of income in the event the property was maintained. Tr. at 236:18-25. Indeed, he noted that it was possible that D'Jamoos would be entitled to yearly income from the properties even after a distribution to the rest of the shareholders. Id. at 226:18-22.[5]

### ii. Time Records

Griffith did not keep contemporaneous time records of the hours he expended during his thirteen year representation of D'Jamoos because he was hired on a contingency basis. Griffith explained that he had to reconstruct his hours based on the documents in his case file and his experience working with other clients. Id. at 246:20-25, 259:6-12. Griffith did not offer this reconstruction, however, until a week prior to the fee hearing, which was held approximately six years after the termination of Griffith's services. Id. at 266:25-267:1. According to Griffith, he did not feel it was necessary to document his hours until after this Court in 2006 decided that he could not recover based on the contingency agreement, there being no monetary resolution on which a 20% fee could be calculated, despite the fact that in 2001 when he counter-claimed for his legal fees he pleaded in the alternative for recovery in *quantum meruit*. Id. at 240:12-15, 241:3-5.

Despite Griffith's lack of diligence, D'Jamoos's objection that this Court may not

---

[5] D'Jamoos also argues that, if this Court permits him to recover anything more than he would have recovered under his contingency arrangement, which D'Jamoos argues is zero, it would constitute unjust enrichment. This Court previously determined that Griffith may not recover under the retainer agreement because recovery under that agreement would be based on ultimate success, and Griffith's services were terminated before the settlement was finalized. However, it is not unjust enrichment to allow Griffith to recover for the *quantum meruit* value of the services he rendered while still in D'Jamoos's employ.

9

award fees where a lawyer does not maintain contemporaneous time sheets flies in the face of the law in this Circuit. While it is true that the burden is on counsel to keep and preserve time records, see F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987), failure to submit contemporaneous records is not fatal to recovery of fees and expenses. Indeed, where attorneys hired on a contingency basis are later discharged, it is permissible to consider an approximation of time rather than detailed contemporaneous time records based on the attorney's expectation that he would not be billing the client on an hourly basis. See Dweck Law Firm, L.L.P. v. Mann, 03 Civ. 8967 (SAS), 2004 U.S. Dist. LEXIS 15730, at *10 (S.D.N.Y. Aug. 6, 2004).

### iii. Calculation of Hours Expended Performing Legal Services

In computing an appropriate amount of attorneys' fees, courts use the lodestar method of multiplying the attorney's hourly rate by the hours of work he performed. Sequa Corp., 156 F.3d at 148-49. Upon reviewing the transcript of the fee hearing as well as the exhibits submitted therewith, the Court adopts the R&R's findings with respect to the total hours expended by Griffith on a yearly basis, as well as the appropriate hourly fees to be applied. The Court need not repeat those findings here.

However, the Court disagrees with the R&R's findings regarding the appropriate reduction to apply to Griffith's estimation of the hours he worked. Throughout the hearing, Griffith referred to his method of calculation as an "approximation." See., e.g., Tr. at 250:14-23. Griffith noted that he did not keep any calendars for the years at issue, nor did he consult the time sheets maintained by other attorneys involved in the case to determine the hours he worked, but instead reconstructed his time using "bellweather events" from the action to refresh his recollection. Id. at 267:20-268:7, 297:18-19,

302:1-3. Of significance is the fact that Griffith refused to provide any approximation of his hours until a week before the fee hearing in 2007, despite the fact that he pleaded in the alternative for recovery in *quantum meruit* in 2001, a time when his memory may have been more acute with respect to the work he performed.

As explained in the R&R, where attorneys approximate the time they expend performing legal services, an across the board reduction in time is appropriate. See R&R at 17-20 (collecting cases). Rather than applying a global reduction to the total hours requested by Griffith, the R&R subtracts 24 hours of travel time and then applies a 15% reduction to three out of twelve years for which Griffith requests reimbursement based on a lack of supporting documentation for those three years. This Court now departs from the R&R and imposes a 15% across the board reduction to Griffith's estimation, after reducing the total hours to account for the reduction in travel time and the initial $10,000 retainer already paid.[6] Therefore, the Court awards Griffith recovery for 391 hours expended between the years 1986 and 1999. Applying the hourly fees described in the R&R, the Court awards Griffith $60,698.75 in fees. See R&R at 36-38.

**C.     Interest**

Pursuant to New York law, prejudgment interest runs from the "earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b) ("Section 5001(b)"). The R&R relies on Dweck Law Firm, L.L.P. v. Mann, 03 Civ. 8967 (SAS), 2004 U.S. Dist. LEXIS 19601, at *5 (S.D.N.Y. Sept. 29, 2004), for the proposition that, where a court calculates interest on fees awarded where an attorney's representation has

---

[6] For 1994, Griffith requested 22.25 hours, however the R&R erroneously reports that he requested 22 hours. See R&R at 25. The Court now calculates the fee using the 22.25 hours requested before making the appropriate reductions as indicated.

been terminated, the interest should be computed to run from the date the attorney was discharged. On motion for reconsideration, the district court in Dweck reasoned that

> [though] many courts have, without analysis, fixed the date from which interest runs as of the date of the first demand for payment, others have used the method adopted by the Court (*i.e.*, the date of termination). The Court found that Dweck's cause of action arose on the date Mann discharged the firm, following Dweck's refusal of Mann's demand that it renegotiate its fee downwards. At that time a cause of action in *quantum meruit* accrued. In short, Dweck must be deemed to have sought payment as of that date.

Id. Plaintiff argues that, despite the district court's holding in Dweck, New York courts calculate interest to run from the date of demand for payment, which this Court construes to be the time Griffith filed his counterclaims against Plaintiff.

There appears to be a conflict in the case law regarding the date on which interest begins to accrue. One district court recognized this conflict:

> Section 5001(b) of the statute provides that interest is to be computed from the "earliest ascertainable date the cause of action existed." It is unclear whether in a *quantum meruit* action interest is to be computed from the date of demand for payment, or from the date of acceptance and completion of the work. Compare Brent v. Keesler, 32 A.D.2d [804, 805 (2d Dep't 1969)] with Elliott v. Gian, 19 A.D.2d [196, 198 (4th Dep't 1963)].

Consol. Rail Corp. v. City of N.Y., 81 Civ. 4206 (CBM), 1983 U.S. Dist. LEXIS 19929, at *3 (S.D.N.Y. Jan. 19, 1983). Brent explains that in cases where attorneys recover their fees in *quantum meruit*, New York courts should compute interest from the date of demand with a limited exception. As the court in Brent wrote:

> Where, as in the instant case, an attorney plaintiff recovers for his professional services in *quantum meruit*, he is normally entitled to interest from the date of demand for payment (Neimark v. Martin, 7 A.D.2d 934 [2d Dep't 1959]). However, where, as at bar, there is some ambiguity as to whether the plaintiff's demand, if one was made prior to suit, predated the completion of the services, recovery for which is sought in *quantum meruit*, interest should be computed from the date of the completion of the services (Elliott v. Gian, 19 A.D.2d 196, 198-199, supra). If the evidence adduced leaves these dates unsettled, the Trial

12

> Justice may appropriately award interest from the time of commencement of plaintiff's actions.

32 A.D.2d at 805. The holding in <u>Brent</u> that interest is computed from the date of demand for payment reflects the rule in New York prior to the enactment of the C.P.L.R. that "a claim for legal services resting on a *quantum meruit* draws interest to be computed from the date of the demand." <u>In re Johnson</u>, 257 N.Y. 108, 111 (1931).

However, the Advisory Committee Notes to Section 5001(b) of the C.P.L.R. indicate that the "date the cause of action accrued is the time normally used in computing interest." Here, Griffith did not need to make a demand for his cause of action to accrue. See <u>Elliott</u>, 19 A.D.2d at 198. The fact that Griffith later demanded that he be paid for his services in response to D'Jamoos's malpractice suit against him is irrelevant to when the cause of action accrued. Therefore, this Court agrees with the R&R that interest in this case began accruing on December 1, 1999 when D'Jamoos terminated Griffith's services, and runs through the date of this Memorandum and Order.

## **CONCLUSION**

For the foregoing reasons, this Court adopts the R&R with the modifications as noted above, and orders D'Jamoos to pay Griffith $60,698.75 in attorneys' fees and prejudgment interest at the rate of 9% per annum, <u>see</u> N.Y. C.P.L.R. § 5004, running from December 1, 1999 to the date of entry of Judgment. The Clerk of Court is hereby directed to calculate the interest.

SO ORDERED.

Dated: Brooklyn, New York
June 25, 2008

_____/s/_____
I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for Plaintiff</u>:

Todd J. Krouner, Esq.
Law Offices of Todd J. Krouner
93 North Greeley Avenue, Suite 100
Chappaqua, NY 10514

<u>Counsel for Defendant</u>:

John A. McManus, Esq.
McManus, Collura & Richter, PC
48 Wall Street, 25th Floor
New York, NY 10005